**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Raymond Brann ALLISON,**
**Defendant–Appellee.**

**No. 91–7039.**

United States Court of Appeals,
Eleventh Circuit.

Feb. 19, 1992.

J.B. Sessions, III, U.S. Atty., Richard H. Loftin, Asst. U.S. Atty., Mobile, Ala., for plaintiff-appellant.

James M. Byrd, Mobile, Ala., for defendant-appellee.

Before ANDERSON and DUBINA, Circuit Judges, and ESCHBACH *, Senior Circuit Judge.

DUBINA, Circuit Judge:

The United States of America (the "Government") appeals the district court's order granting Raymond Brann Allison's ("Allison") motion to suppress. The district court granted Allison's motion on the ground that there was insufficient evidence to warrant a finding of probable cause to justify his warrantless arrest and warrantless search of his car. For the reasons which follow, we reverse.

## I. BACKGROUND

### A. *Facts*

On June 21, 1990, Drug Enforcement Administration ("DEA") agents were conducting an undercover operation at the AWC Chemical Company ("AWC") in Eight Mile, Alabama. The decision to conduct

---

* Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit sitting by designation.

the surveillance operation was based on information received by the DEA that certain individuals from Texas had placed an order for all of the essential chemicals needed to manufacture phenylacetone ("P2P"), an amphetamine. While posing as an employee of AWC, one of the undercover DEA agents, Douglas Lamplugh ("Lamplugh"), discovered a second suspicious order for chemicals that could be used to manufacture P2P and methamphetamine. That order was placed under the name of Joel Chandler ("Chandler").

Approximately 10:15 a.m. that same day, Allison arrived to pick up the Chandler order and Lamplugh arranged to load the chemicals into Allison's car. Since Allison was only purchasing two of the four chemicals needed to manufacture methamphetamine, Lamplugh asked Allison if he would like to purchase other chemicals from the warehouse without going through the front office or filling out paperwork or invoices. When Allison stated that he would like to purchase another case of acidic anhydride, Lamplugh informed him that there was another case available, but that he could not sell it to him at that time because there were other people in the warehouse. Instead, Lamplugh told Allison that if he was interested, he could call Lamplugh on his beeper. Allison also requested a supply catalog for laboratory equipment and inquired about purchasing glass stoppers that would fit a triple neck flask and a vacuum tube. Prior to leaving, Allison asked whether AWC was under law enforcement surveillance. When Lamplugh assured him that it was not, Allison remarked that he had heard as much and that was the reason he had chosen to purchase the chemicals from AWC. Following that exchange, Allison left AWC.

Local Task Force agents followed Allison in their cars and arrested him. Allison told the agents that he wanted to cooperate. The agents instructed Allison not to speak until after he was *Mirandized*.[1] After being read his *Miranda* rights, Allison told the agents that in return for picking up the

chemicals from AWC he had been given $200.00 and approximately one gram of methamphetamine from an individual known as Willie Cook. Allison also told the agents that he understood the chemicals were to be used to manufacture methamphetamine, a portion of which he believed would be given to him in return for his services.

Allison was then taken to DEA headquarters, where he was again read his *Miranda* rights. He reiterated his previous statement, except that he denied he was to receive any drugs as payment for his services.

A search of Allison's car revealed two syringes containing a liquid solution, a plastic envelope with a white powder residue, and a spoon with residue. Allison admitted that all of the items belonged to him. He stated that the residue was the remainder of the methamphetamine that he had been given prior to driving from Texas to Alabama.

## B. *Procedural History*

On July 2, 1990, an indictment was returned against Allison, charging him with conspiracy to manufacture and attempt to manufacture P2P and methamphetamine, in violation of 21 U.S.C. § 846(a); with possession of methamphetamine, in violation of 21 U.S.C. § 844(a); with interstate travel in aid of racketeering, in violation of 18 U.S.C. § 1952(a); and with use of a telephone to facilitate the commission of a felony, in violation of 21 U.S.C. § 843(b).

Allison filed a motion to suppress all physical evidence seized from him or his automobile at the time of his arrest and all statements made by him at or about the time of his arrest. The district court conducted an evidentiary hearing and then granted Allison's motion.

The Government filed a motion to reconsider that ruling, which was denied. This appeal followed. Allison is currently incarcerated pending this appeal.[2]

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. Allison had initially been released on bond pending trial despite the Government's motion for detention; however, he tested positive for

## II. STANDARD OF REVIEW

■ The review of a district court's ruling on a motion to suppress evidence is a mixed question of law and fact. The district court's findings of fact are reviewed under the clearly erroneous standard, whereas its application of the law to those facts is subject to *de novo* review. *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir.1991) (en banc). In reviewing the district court's ruling, we must construe the facts in the light most favorable to the party prevailing below. *Id.*

## III. DISCUSSION

The Government asserts that there was probable cause to justify Allison's arrest and that the evidence discovered and the statements made subsequent to the arrest were not the product of an illegal search and seizure. The Government argues that the district court erred because it analyzed the probable cause factors separately and found an innocent explanation for each factor rather than considering the totality of the circumstances as required by *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

The Government cites *United States v. Tasto*, 586 F.2d 1068 (5th Cir.1978) as analogous to the present case. In *Tasto*, the Fifth Circuit held that the critical element in determining whether there was probable cause was not how many precursors to the manufacture of PCP the defendant possessed, but whether those ingredients were significant for the manufacture of the drug. The Government argues that the analysis set forth in *Tasto* should apply to this case because Allison was in posses-

sion of one of the three chemicals needed to make P2P and two of the four chemicals used to manufacture methamphetamine.[3]

Allison counters the Government by arguing that the DEA agents lacked probable cause to arrest him and that any evidence seized at the time of the arrest as well as any inculpatory statements were tainted by the illegal arrest. He contends that because the arrest was illegal, the district was correct when it granted his motion to suppress the incriminating evidence.

Additionally, Allison argues that he was under arrest at the moment he was stopped by the Task Force agents because he was not free to leave. The record demonstrates that Allison's automobile was stopped and partially blocked from further movement by the arresting agents' automobiles. Allison was ordered out of his car by one agent who approached Allison with his firearm drawn and held by his side.

In its brief, the Government does not directly address Allison's argument that the initial stop was an arrest, but argues that Allison's inquiry regarding the police surveillance at AWC and his interest in purchasing the chemicals without following the proper procedures were sufficient to justify, at a minimum, a *Terry*[4] stop. The Government contends that the above information, coupled with all of the other information known to the agents, supplied ample evidence to support a finding of probable cause to justify Allison's arrest.[5]

■ When the constitutional validity of an arrest is challenged, it is the function of the court to determine whether the facts available to the arresting officers at the

---

the presence of amphetamine and methamphetamine in urine samples taken from him on July 16, 1990, August 8, 1990, and March 19, 1991. Allison also tested positive for the presence of THC metabolite in a sample taken on March 19, 1991. Based on the results of these tests, the United States magistrate judge granted the Government's motion to revoke Allison's bond.

**3.** Lamplugh testified at the suppression hearing that Allison had purchased two of the three essential precursor chemicals used to manufacture methamphetamine—acetic anhydride and methylamine; however, as in *Tasto*, that state-

ment was incorrect because four chemicals are actually required in the manufacturing process. Phenylacetic acid, acetic anhydride, and sodium acetate are essential to manufacture P2P. When this mixture is combined with one additional chemical, methylamine, P2P is converted to methamphetamine.

**4.** *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**5.** In its order, the district court found that Allison was under arrest. We agree with that finding.

moment of the arrest support a finding of probable cause. *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). Probable cause exists where the facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested. *United States v. Waksal,* 709 F.2d 653, 658, n. 8 (11th Cir.1983). Where there is at least minimal communication between different officers, the collective knowledge of the officers determines probable cause. *United States v. Astling,* 733 F.2d 1446, 1460 (11th Cir.1984). While probable cause requires only a probability or substantial chance of criminal activity, mere suspicion is not enough. *United States v. Ingrao,* 897 F.2d 860, 862 (7th Cir.1990). The question of what amounts to probable cause is purely a question of law and hence is subject to plenary review by this court. *United States v. Tobin,* 923 F.2d at 1510.

█ In the present case, the district court held that the Government failed to produce any evidence that Allison was breaking the law by purchasing the chemicals because none of the chemicals were controlled substances and because there existed legitimate uses for the chemicals other than illegal drug manufacturing.[6] The district court further held that the Government failed to present evidence that the agents had any knowledge that Allison was a known dealer, user, or manufacturer of methamphetamine. The district court rejected the Government's argument that Allison's picking up an order that had been placed under a name other than his own was unusual. Additionally, the district court was unpersuaded that Allison's arrival in a rental car with Texas plates or his Texas identification was significant because it found that the agents "did not know that the defendant was from the State of Texas," but rather simply supposed that to be a fact, which in itself did not lead to a conclusion that Allison was breaking the law. The district court stated

that the most incriminating factor pointing to Allison's alleged illegal activity was his interest in purchasing chemicals through the "backdoor" of AWC, which, coupled with his concern about law enforcement surveillance, could reasonably have aroused the agent's suspicions. However, the district court stated that more than suspicion was required to "support the intrusion of a full blown arrest." The district court concluded that Allison's arrest was without probable cause and suppressed the evidence seized as a result of that arrest. We disagree with the district court's conclusion.

█ Probable cause exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates,* 462 U.S. at 238, 103 S.Ct. at 2332. An arrest without a warrant is constitutionally valid if, at the moment the arrest was made, the officer had probable cause to make such an arrest. *Beck v. Ohio,* 379 U.S. at 91, 85 S.Ct. at 225.

In *United States v. Preston,* 608 F.2d 626 (5th Cir.1979), we affirmed the district court's finding that law enforcement officials had probable cause to arrest the defendant on charges of bank robbery. The factors cited in that case were as follows: (1) the defendant had arrived at a house located near to the last known whereabouts of the robbers shortly after the offense was committed; (2) the defendant changed his appearance following his encounter with the investigating officer; (3) the defendant had allegedly walked to the house without a coat or hat, on what was described as a cold day; later two windbreakers, believed to have been discarded by the robbers, were found in the vicinity; and (4) the defendant later gave inconsistent statements about where he worked and lived. In upholding the finding of probable cause and, subsequently, the admission of the defendant's inculpatory remarks made after his arrest, we held that the facts known to the officers were, when taken as a whole, sufficient for the officers to have

---

**6.** For example, Lamplugh testified that he was aware that methylamine could be used in the process of tanning hides by taxidermists.

reasonably believed that the defendant was a participant in the crime. *Id.* at 632.

In *United States v. Tomaszewski,* 833 F.2d 1532 (11th Cir.1987), the defendant's motion to suppress was denied based upon the arresting officer's observations of the following: (1) the defendant had arrived from West Palm Beach, an alleged source city for cocaine; (2) the officer observed the defendant walking through the airport with a suspicious bulge in his pants; and (3) the defendant appeared to be nervous and tried to avoid the officers.

While *Preston* and *Tomaszewski* are factually distinguishable from the case before us, we find the reasoning in those cases persuasive. In each of those cases, the total of all of the evidence available to the officers prior to the arrest was analyzed by the court to determine whether probable cause existed. See also, *United States v. Bell,* 833 F.2d 272 (11th Cir.1987) (existence of many circumstances, which taken together, were sufficient to establish probable cause).

In the present case, the agents were aware of the following facts at the time of Allison's arrest: (1) that an order for four gallons of ether, four gallons acetic anhydride and four gallons of methylamine had been placed in the name of Joel Chandler, a bogus name; (2) that those chemicals were necessary to manufacture P2P and methamphetamine; (3) that Allison had arrived in a rental car with Texas license plates [7] and that Allison had displayed Texas identification; (4) that Allison had paid for the chemicals with a money order, which is often used to avoid identification; (5) that in response to agent Lamplugh's suggestion, Allison told Lamplugh he was interested in purchasing additional chemicals and glass stoppers that would fit a triple-neck flask and a vacuum tube, without filling out the required paperwork; and (6) that Allison was concerned about law enforcement surveillance because Allison specifically asked if AWC was being watched and stated that he had chosen to buy his chemical supplies there because he had heard that it was not under surveillance.

It is clear that the foregoing facts, when considered together, were sufficient to form a reasonable belief that Allison was conspiring to manufacture a controlled substance. Thus, we are persuaded that there was sufficient evidence to warrant a finding of probable cause and, therefore, justify Allison's warrantless arrest.

## IV. CONCLUSION

When we consider the totality of the circumstances known to the arresting agents, we conclude that Allison's arrest was constitutionally valid and not in violation of his Fourth Amendment rights. Thus, the district court erred in granting Allison's motion to suppress. Accordingly, we reverse the district court's order and remand this case for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**

---

7. Lamplugh testified that based on his experience in clandestine drug operations the majority of methamphetamine cases originated in Texas. He stated initially that he believed Allison was working in concert with other individuals under surveillance at the plant suspected of manufacturing controlled substances; however, he later learned that Allison had no connection with this other group.