**UNITED STATES of America,**

v.

**Tam WAI–KEUNG, Sun Cheung, Raymond Ching, Lai Hui–Chui, Wong Siu–Fun, Li Chi–Cheong, and Alex Lixin Qiu.**

No. 91–0061–CR–KMM (JM).

United States District Court, S.D. Florida.

March 8, 1994.

they were transported after their arrest on similar grounds. They also challenge the admissibility of statements made by them while in custody. Next, they challenge a warrantless search of a vehicle that had been rented by Li and parked in a hotel valet parking lot. Finally, they challenge the warrantless search of the hotel room in which they were purportedly staying. In addition, Li moves to suppress statements he made to the police both before and after his arrest. Sun challenges several subsequent but related searches in California and Macao.[2]

Ruling from the bench, I denied the motion in its entirety on Wednesday, January 12, 1994. At that time, I told the parties that I would file a memorandum setting forth in full detail the reasons for my ruling. Subsequently, all five defendants[3] pled guilty to Counts 1 and 2 of the indictment (RICO and RICO conspiracy). Defendant Li will be permitted to appeal the denial of his motion to suppress on two grounds: first, that there was no probable cause to arrest him, and the fruits of the illegal arrest should have been suppressed; and second, that his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)) were violated when agents took statements from him on January 29, 1993. If the decision on the motion is reversed, he will be allowed to withdraw his plea. *See* FED.R.CRIM.P. 11(a)(2).

Because of the disposition of the case, this memorandum, which will constitute the findings of fact and conclusions of law on which my ruling is based, will concentrate on Li's motion. It will, however, discuss all defendants' motions.

Kendall B. Coffey, U.S. Atty. by Peter Prieto, Asst. U.S. Atty., Miami, FL, for U.S.

Paul D. Lazarus, Miami, FL, for defendant Tam Wai–Keung.

John F. O'Donnell, Ft. Lauderdale, FL, for defendant Sun Cheung.

Michael Smith, Ft. Lauderdale, FL, for defendant Raymond Ching.

Office Of The Federal Public Defender by Howard Srebnick, Asst. Federal Public Defender, Miami, FL, for defendant Li Chi–Cheong.

Joel DeFabio, Coral Gables, FL, for defendant Alex Lixin Qiu.

MISHLER, District Judge, Sitting by Designation.

Defendants Tam and Li, joined by defendants Sun and Ching[1], move to suppress evidence obtained at four distinct stages in the proceedings incident to their arrest. First, they challenge the legality of their arrest based on lack of probable cause. Second, they challenge an inventory search of Li at the police station as a warrantless search not incident to a lawful arrest. They next challenge a search of the police car in which

## BACKGROUND

### The arrest

On January 28, 1993, Secret Service Agent William Cachinero responded to a call from

---

**1.** With the exception of Raymond Ching and Alex Lixin Qiu, the defendants' first names are their family names.

**2.** Sun's attorney made these challenges orally at a status conference held on January 5, 1994. Because of the disposition of the case, the court will not address this aspect of the motion except

to indicate that it would deny it based on the outcome of the rest of the motion.

**3.** Defendants Lai and Wong are fugitives and did not participate in any of the proceedings before the court.

the Saks Fifth Avenue store in the Bal Harbor Mall. The call came from Bruce Isaacs, a security representative in the store. He suspected four Asian men of using counterfeit credit cards, and asked Agent Cachinero to investigate.

Agent Cachinero had prior experience investigating credit card fraud. He had been fully trained by the Secret Service in identification of fraudulent credit cards; he had had a year of extensive training. Currently, he is assigned to the access device fraud squad in the Miami field office of the Secret Service.

In early January of 1993, Agent Cachinero had learned of an investigation in West Palm Beach in which Asian males had been posing as rich businessmen and had been purchasing high-end items, such as Louis Vuitton and Chanel bags and Rolex and Cartier jewelry, with fraudulent credit cards. Four individuals had been arrested in that scheme.

On January 12, 1993, Agent Cachinero had responded to a call from Tourneau Jewelers in the Bal Harbor Mall. The store clerk had noticed that an Asian male wanted to purchase two Rolex watches with a credit card. Tourneau's West Palm Beach store had contacted the Bal Harbor store about the scheme in West Palm, and the clerk at Bal Harbor became suspicious. When the clerk attempted to verify the card the suspect fled, leaving behind a California driver's license he had used as identification. Agent Cachinero subsequently confirmed that the credit card and the license, both in the name Kee Lee, were fraudulent.

After investigating at Tourneau, Agent Cachinero had spoken to representatives at Louis Vuitton, Gianni Versace and Saks Fifth Avenue in the Bal Harbor Mall about the *modus operandus* of an organized gang of Asian men using fraudulent credit cards to purchase expensive merchandise from high-end stores. Bruce Isaacs of Saks had told Agent Cachinero that Saks was aware of the ring of Asian men victimizing luxury stores, as two individual Asian men had each used a fraudulent credit card at Saks on December 22 and 23, 1992, each using the name Kee Lee, and had gotten away with merchandise purchased from the Louis Vuitton and Chanel counters. The men operated, according

to the sales clerks at those counters, in pairs, with one of the pair presenting the credit card and the other standing inconspicuously in the background.

Agent Cachinero obtained receipts from the fraudulent transactions and checked with the Secret Service West Palm Beach field office. The name on the receipts, Kee Lee, matched the name of one of the suspects in custody in West Palm Beach. However, when Agent Cachinero got pictures of the four, none of them matched the picture on the license in the name Kee Lee recovered from Tourneau Jewelers.

Agent Cachinero also spoke with a fraud investigator for MasterCard, confirming that there was an organized ring of Asian males victimizing local stores with fraudulent credit cards.

Armed with this background, Agent Cachinero got the call from Bruce Isaacs at about 7:00 on the evening of January 28, 1993. Mr. Isaacs stated that there were four Asian men in Saks Bal Harbor, two at the Chanel counter and two at the Louis Vuitton counter, making large purchases using credit cards. He further told Agent Cachinero that some of their credit cards were being rejected, and that the men fit the *modus operandus* about which Agent Cachinero had told Mr. Isaacs in their earlier conversation.

By the time Agent Cachinero arrived, between 7:45 and 8:00, the four suspects had left Saks. Mr. Isaacs had a videotape of them, which Agent Cachinero watched. The tape showed two Asian men at the Chanel counter and two others at the Louis Vuitton counter. One of the men at the Chanel counter was paying for the merchandise with a credit card in the name of Yeun Man Sing, which Agent Cachinero determined from the credit card receipts kept by Saks. The man using the Sing credit card also presented an Indonesian driving permit as identification. Isaacs gave Agent Cachinero copies of the credit card receipts and the driving permit.

The other man at the Chanel counter was a stocky, heavyset man. At some point during the ½–hour–long tape, Agent Cachinero noticed the man with the Yeun Man Sing card furtively hand something that could

have been a credit card to the stocky man. At that point, the stocky man walked away and did not return.

At the same time, the two men at the Louis Vuitton counter, who were later identified as defendants Ching and Qiu, were making purchases with another credit card, this one in the name of Johnson P.K. Ho (which Agent Cachinero again discerned from the credit card receipts). At no time did anyone from the group at the Vuitton counter have any contact whatsoever with anyone from the group at the Chanel counter. The men at the Vuitton counter purchased about $5,000 worth of merchandise; the men at the Chanel counter purchased $5,782.95 worth.

The behavior of the four individuals looked suspicious to Agent Cachinero. In part, this was because of the hand-off of a credit-card sized object between the two men at the Chanel counter; in part, it was because the men appeared to Agent Cachinero to be nervous. It was also because the men fit the profile of the Asian group that Agent Cachinero suspected was behind the prior Saks incident and the incidents at the Tourneau stores in Bal Harbor and West Palm Beach.

Agent Cachinero left Saks and went to Tourneau Jewelers, where he told the clerk about what had just happened in Saks. The clerk reported that Tourneau had almost been victimized again a few days earlier by an Asian man with a fraudulent credit card. Agent Cachinero showed the clerk a photocopy of the Indonesian driving permit he had gotten from Isaacs. The clerk identified the man in the picture, who used the Yeun Man Sing credit card in Saks, as the same man who had attempted to use the fraudulent credit card.

While Agent Cachinero was at Tourneau, an off-duty uniformed policeman overheard his conversation with the clerk and advised him that four Asian men were making large purchases in the Gianni Versace store in the mall. Agent Cachinero entered Versace and saw three men he had not seen before in the company of the stocky, heavyset man from the Chanel counter. The three men were

defendants Sun, Li, and Tam. Sun was at the counter; Tam and Li were browsing among the merchandise, where Agent Cachinero saw Tam hold up a white shirt and talk to Li about it; and the stocky, heavyset man was sitting in a chair facing the mall, acting, according to Agent Cachinero, as the lookout.

Agent Cachinero walked up to the counter and positioned himself next to Sun. As he did so, the clerk handed Sun a MasterCard and told him that it had been rejected. Sun placed a Visa card on the counter in order to give it to the clerk. Agent Cachinero then noticed that the name on the credit card was Johnson P.K. Ho, the same name used at the Vuitton counter in Saks by defendant Ching only an hour earlier. Agent Cachinero noticed that one security feature of the Visa card, the "flying V", was incorrectly embossed on this card.[4] In addition, at some point Tam also engaged in a transaction in Versace.

At this point, the four defendants went outside to smoke and talk among themselves. Agent Cachinero left Versace and told the police officer to keep an eye on the defendants in case they left the mall. He attempted to verify the credit card information he had gotten from Saks, but was unable to do so as most of the banks were closed. He telephoned his supervisor, who suggested that he try to identify the individuals using the credit cards.

Agent Cachinero returned to Versace and again stood next to Sun at the counter. He saw Sun sign the name "Johnson P.K. Ho" on the credit card receipt. The cashier then handed a bag of merchandise to someone in the group.

At this point, with all four men still in the store, Agent Cachinero left again. He told the off-duty police officer to get backup to follow the defendants. He then went to Tourneau to call his supervisor, which he did, and to try to verify the credit card information, which he again was unable to do.

4. The "flying V" is the embossed "V" to the left of the Visa logo. It is distinctive because the left arm of the "V" is completely vertical and has a serif at the end; the right arm extends out at an angle.

After departing Tourneau, the off-duty policeman told Agent Cachinero that the stocky, heavyset man he had seen on the video and in Versace had gone off in a different direction than the other three defendants. They proceeded to the Oxygene boutique, where the defendants had gone and where Officer Rafael Cubela of the Bal Harbor Police Department was waiting.

Agent Cachinero and Officer Cubela were able to see into Oxygene. They observed the three defendants, Li, Tam, and Sun at the cashier's counter right next to each other. They then entered the store and observed Sun sign what appeared to be a credit card receipt; Tam and Li were right next to Sun when he did this. The cashier then handed a bag of merchandise to one of the three men.

At this point, Agent Cachinero and Officer Cubela approached the three defendants. Agent Cachinero identified himself as a Secret Service agent and asked for identification.

Sun produced a California driver's license. Three things immediately struck Agent Cachinero. First, the picture on the license was not that of Sun. Second, the license, like the license in the name of Kee Lee that Agent Cachinero had recovered from Saks two weeks earlier, was typed rather than computer-generated. Third, the name on the license was Johnson P.K. Ho.

Agent Cachinero also asked for identification from the other two suspects. Tam produced a Hong Kong identity card in his own name; Li produced a Florida driver's license in his name.

Agent Cachinero asked Sun if he could search his wallet, which Sun had taken out to produce the license. Sun handed it to him. Agent Cachinero found three credit cards in the wallet, two MasterCards and one Visa.

As he was trained to do, Agent Cachinero compared the credit cards from Sun's wallet with his own cards. He noticed immediately that the first MasterCard was counterfeit; he could tell because the globes in the hologram did not interlock as they did in the true MasterCard hologram. Similarly, the hologram of the second card was not three dimensional, and it also consisted of non-inter-

locking globes. The Visa card was the card Agent Cachinero had seen Sun using earlier and had determined to be counterfeit. All three cards were in the name of Johnson P.K. Ho.

In addition to his identification, Tam produced three credit cards in his own name that appeared to be genuine. Li had no credit cards with him.

At this point, Agent Cachinero advised the defendants that they were using counterfeit credit cards and that he was taking them to the police station for further questioning. Officer Cubela patted down the defendants. Agent Cachinero asked whether they had a vehicle. Li told him that he had taken a bus to the mall.

*The inventory search at the police station*

Since the defendants had to be brought to the police station in Officer Cubela's police cruiser, standard police procedure required that they be handcuffed. When he was done patting them down, Officer Cubela handcuffed them to one another and escorted them out of Oxygene.

The three defendants were transported to the Bal Harbor Police Department in the back of Officer Cubela's police cruiser. The ride took only a minute or two. Officer Cubela, who was driving, noticed a lot of movement in the back seat; the defendants also talked among themselves in their native language.

When they arrived at the station, Officer Cubela decided to remain with the defendants in the cruiser until Agent Cachinero got there. After about three or four minutes, during which Officer Cubela noticed more movement and talking among the defendants, Officer Cubela decided to take the defendants into the station, since it can get quite hot in the back of the cruiser. He escorted them to a holding cell in the station, removed their handcuffs, and read them their *Miranda* rights in English. Officer Cubela was aware that Li spoke both English and Chinese, and he also knew that Sun spoke some English.

Agent Cachinero arrived at the police station. He contacted the Los Angeles field

office of the Secret Service, and confirmed that the three credit cards he had recovered from Sun were counterfeit; the bank identification number (BIN), which is the first six numbers on a credit card, did not match the banks printed on the face of the cards.

At that point, the defendants were escorted out of the holding cell and processed—that is, fingerprints were taken, their property was inventoried, and they were asked basic personal information. In Li's pocket was a valet receipt for a car from the Sheraton Bal Harbor hotel, which is directly across the street from the Bal Harbor Mall. When Agent Cachinero asked Li about the receipt, Li looked down and refused to answer.

*The first search of Li's car at the Sheraton Bal Harbor*

Agent Cachinero gave Officer Cubela the receipt and asked him to verify whether the car was still parked at the hotel. Officer Cubela called the Sheraton to confirm that the car identified by the ticket was still in the parking lot. It was, and Officer Cubela instructed the valet to hold on to the keys. He also advised Agent Cachinero that the car was in the hotel parking lot.

Officer Cubela, accompanied by another officer, went to the Sheraton Bal Harbor and obtained the car keys. He instructed the valet to lead him to the car in the place it was parked. As soon as the valet had led Officer Cubela to the car, he left.

The car was a white sedan. Officer Cubela opened the car with the keys and searched it. Concealed inside the passenger-side sun visor, which was up, was a sheet of paper with names, account numbers, and monetary amounts. Scattered throughout the car were various receipts. In the glove compartment was Li's passport and the rental agreement. He retrieved all of these.

Officer Cubela also searched the trunk of the car, in which he saw several liquor bottles, a bag with a vest, and a camera lens. He did not remove anything from the trunk.

After completing his search, Officer Cubela locked the car. He asked the valet if the person who parked the car was staying at the hotel. The valet advised him that the person presenting the car was staying in Room 536 of the Sheraton Bal Harbor.

Officer Cubela then went to the front desk and asked the clerk who was staying in room 536. The clerk told Officer Cubela that Room 536 was rented by a Dr. Giao Hangoc, who had also rented Rooms 506 and 532. Officer Cubela then returned to the station with the passport, list of account numbers, rental agreement, receipts, and the keys to the white sedan.

*The search of the police cruiser and the second search of Li's car*

When he returned, at about 11:00 or 11:30 p.m., Officer Cubela advised Agent Cachinero about what he had found. Agent Cachinero asked Officer Cubela whether he had searched the back seat of his police cruiser, in which the defendants had been transported. Although such a search is routine, Officer Cubela had overlooked it. He went out to the car and searched the rear of it.

Officer Cubela found a number of items tucked between the seat and the backrest. These included a key to a room safe at the Sheraton Bal Harbor,[5] an address book, credit cards and receipts. He returned inside and gave these items to Agent Cachinero.

As they walked past the holding cell carrying the items, both men heard Sun say something like "Huh-oh". Agent Cachinero asked Sun if the book was his; Sun said no, it was not. He asked the other defendants, who shook their heads no.

Agent Cachinero examined the address book. In it, he found several signature panels that are found on the backs of credit cards. He also found the name Johnson P.K. Ho written in the book.

Earlier in the evening, Agent Cachinero had called for additional agents to help him with the paperwork. Two agents, Agent Kalb and Agent Ottaviano, had arrived at the station house at about 9:00 that evening.

---

5. Officer Cubela knew that the key was for a room safe at the Sheraton because he had stayed at the Sheraton for two weeks in the aftermath of Hurricane Andrew in the fall of 1992 and had used the room safe. He had also done some security work for them in his off-duty hours.

Agent Cachinero decided to release Li at about 3:00 a.m. the morning of the 29th. Agents Kalb and Ottaviano drove Li to his car in the hotel parking lot. When they arrived at the car, the agents asked Li if he would consent to a search of the vehicle. Li filled out a consent-to-search form, and the agents searched the car. Li was not told that the car had been searched earlier in the evening, although the passport that had been seized from the car had been returned to him before he left the police station. The agents found some empty bags and the liquor that Officer Cubela had left in the trunk, but did not seize anything. After the search, the agents gave Li the keys and let him go.

*The search of the rooms at the Sheraton Bal Harbor*

Agent Cachinero and Officer Cubela went to the Sheraton Bal Harbor at about 2:00 a.m. on the morning of January 29, 1993. He called each of the three rooms, 506, 532 and 536, on the house phone and got no answer in any of the rooms. Agent Cachinero then went up to the fifth floor and knocked on the door of each of the rooms. No one answered any of the knocks. At that point, Agent Cachinero and Officer Cubela returned to the police station.

The next morning, at about 10:00 a.m., Agent Cachinero called the hotel and spoke with Brian Elduff, the head of security. He advised them that the defendants had rented three rooms with a credit card under the name of Giao Hangoc, and that the credit card did not belong to them. He explained that he had arrested the defendants for using counterfeit credit cards, and suspected that the card in Dr. Hangoc's name was fraudulent.

When he rang off with the Sheraton, Agent Cachinero called American Express (Amex) to obtain Dr. Hangoc's telephone number. He knew that the credit card used to rent the rooms was an Amex card because of the credit card number, which Officer Cubela had obtained from the clerk the night before. He obtained Dr. Hangoc's phone number and called to ask him whether he had rented any rooms at the Sheraton Bal Harbor. Dr. Hangoc said that he had not,

nor had he lent his card to anyone or authorized anyone else to use it.

Agent Cachinero then contacted Elduff again, at about 11:00 a.m., to advise him that the transactions at the hotel were fraudulent. Elduff told Agent Cachinero that he was going to send someone from the housekeeping staff into the three rooms to see whether they had been abandoned. He was also going to contact his legal department to see about the necessity of a warrant.

At about 1:30 p.m. that afternoon Elduff called Agent Cachinero. He told the agent that rooms 506 and 536 had been checked in for one night with check-out on the 29th, and room 532 was checked in for two days, with check-out on the 30th. Normal check-out time was 12:00 noon; the hotel extended late check-out privileges, until no later than 3:00 p.m., as a courtesy to its guests if they requested it. According to the defendants, Tam was staying in Room 506, Ching in 532, and Sun in 536.

Elduff advised Agent Cachinero that both he and the housekeeping staff had been in the rooms after noon and had found no personal items or belongings in any of the rooms, although the room safe in Room 506 was locked. Furthermore, the rooms had not been slept in. Sheraton's legal department considered the rooms abandoned, since they had been obtained by fraud and since there were no personal belongings left in the room to indicate that the occupants would return.

Agent Cachinero briefed his supervisor about what was happening in the case. At that point, the supervisor sent Agents Kalb and Maddox and Crime Scene Technician Bertani from the Bal Harbor Police Department to the Sheraton Bal Harbor. The three arrived at the hotel at about 3:00 p.m. and waited for Elduff, the director of security, for about 45 minutes. They then proceeded with Elduff directly to the fifth floor.

They first entered Room 532; Elduff knocked on the door, got no answer, and used his passkey to open the door. The beds were unmade. The agents noticed empty shopping bags, cigarette butts, and packs of cigarettes, some of which were partially full.

They seized the cigarette packs, and found what appeared to be two marijuana cigarettes inside in addition to the regular cigarettes. They turned this over to the crime scene technician.

They next proceeded to Room 536, which had already been cleaned. Again they found no luggage or personal belongings. The safes in both rooms were empty, and the keys to the safes were secure in the locks.[6]

Finally they entered Room 506. It, too, had been cleaned, and was free of luggage or personal belongings. However, the key was not in the safe lock. The agents tried the key that had been recovered from Officer Cubela's police cruiser; it fit the lock, and the agents opened the safe. Inside, they found that the safe was filled with cigarette packs that contained unembossed credit cards, embossed credit cards, and various types of identification cards, including California driver's licenses, INS resident alien cards, and foreign identification cards. Also in the safe were two ledgers filled with information about many credit card accounts.

As the agents were conducting the search of the safe in Room 506, a woman attempted to check in to the room with her luggage. Elduff took her outside the room and spoke to her, and she left.

*The interview of Li at his home*

On the evening of the 29th, Agents Kalb and Hernandez attempted to re-interview Li. They went to his home address, which they had gotten from his driver's license the night before. At approximately 8:00 p.m. they knocked on his door. He answered, and refused to go with the agents to the Miami field office. The agents requested that he talk to them there. He did not invite the agents in; rather, he came outside and the three of them spoke in his front yard.

The first thing the agents did was to read Li his *Miranda* rights again. After hearing his rights, Li agreed to talk to the agents. He said that he had been hired by a man known to him as Sing. Li said that Sing had met him at a restaurant and offered to hire

him to act as chauffeur for one of Sing's associates.

Li stated that on two occasions he took Sing to the Sheraton Bal Harbor. On one occasion, Li waited in the lobby while Sing went upstairs. Li said that Sing was staying in Room 536.

Sing told Li that he could make some easy money. Part of his duties would be to accompany Sing, Tam, and Sun shopping, help to carry bags and drive them around. Li did this, and witnessed Sing, Tam, and Sun go into various stores and purchase items. Li was aware that Sing supplied Sun with the cards to make the purchases, and Tam helped to select the merchandise. Li also told the agents that he knew there was something wrong with the credit cards, that they did not belong to Sing. Finally, Li stated that he never received or used any of the credit cards.

At that point, the agents asked Li to execute a written statement. Li then stated that he wanted to talk to his attorney first, and the agents immediately discontinued the interview.

### DISCUSSION

*Probable cause*

■ Defendants challenge their initial arrest because, they claim, there was not probable cause to arrest them. "Probable cause exists where the facts and circumstances *within an officer's knowledge and of which he had reasonably trustworthy information* are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *United States v. Allison*, 953 F.2d 1346, 1350 (11th Cir.1992) (emphasis added). It is "'the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers. We weigh not the individual layers but the "laminated" total.'" *United States v. Clark*, 559 F.2d 420, 424 (5th Cir.1977) (*quoting Smith v.*

---

6. The keys to the room safes are kept in the locks. If a guest wants to secure his belongings, he locks them in the safe and takes the key. When he checks out, he leaves the key in the lock.

*United States,* 358 F.2d 833, 837 (D.C.Cir. 1966) (Burger, J.)). Since a finding of probable cause requires only a probability of criminal activity, *Allison,* 953 F.2d at 1350, a court assessing probable cause in hindsight must assess both the totality of the circumstances and the inferences that flow from those circumstances. *Clark,* 559 F.2d at 424; *see United States v. Campbell,* 920 F.2d 793, 796 (11th Cir.1991) *(citing Clark).*

█ Using this test, the government has shown that Agent Cachinero had probable cause to arrest each of the defendants. As to the group, he knew from his prior training and experience how such groups operated. He was aware of the investigation and arrests in West Palm Beach, and the *modus operandus* of that group. He had personally investigated an incident at Tourneau Jewelers in the Bal Harbor Mall only a month before the events in this case, and had been told of other similar incidents at Tourneau and Saks. He knew that the purchases made in the previous incidents were substantial, as were the purchases in the instant situation. Also in each instance at least one credit card was rejected before the sale went through. In short, he had reason to be suspicious of a group of Asian males making large credit card purchases with several credit cards from exclusive stores in the Bal Harbor Mall.

In addition to his knowledge of the prior incidents at Saks and Tourneau, on January 28, 1993, Agent Cachinero knew that Isaacs, a trained security officer, suspected the two groups of men at the Chanel and Vuitton counters of using unauthorized or counterfeit credit cards because several of the cards they initially presented were rejected and because they were acting suspiciously. Such reliable information, although not acquired first-hand, may be one of the building blocks or layers of a determination of probable cause. *Allison, supra; United States v. Sweeting,* 933 F.2d 962, 964–65 (11th Cir. 1991) (corroboration of informant's information sufficient for showing of probable cause); *cf. Swint v. City of Wadley,* 5 F.3d 1435, 1444 (11th Cir.1993) (probable cause may be based on information from reliable informant combined with extrinsic evidence or other reason to believe information). The extrinsic infor-

mation in this case came from Agent Cachinero's subsequent investigation that evening; Isaacs' information was substantially corroborated.

When he was shown the videotape at Saks, Agent Cachinero saw two pairs of Asian males making large credit card purchases, one pair each at the Louis Vuitton and Chanel counter. This exactly matched the operating method of the men who had victimized Saks in December 1992. Furthermore, the name on one of the Saks receipts in the December incident, Kee Lee, matched the name of one of the Palm Beach suspects. None of the four suspects, however, matched the picture on the license that the suspect had left at Tourneau. Agent Cachinero could infer two things from this: first, there was an organized group of substantially more than four men committing these crimes; and second, that at least some of the men were using aliases when they made their purchases.

From the receipts he obtained from Isaacs on the 28th, Agent Cachinero knew that Ching and Qiu, the men at the Vuitton counter, were using a credit card in the name of Johnson P.K. Ho, and that the men at the Chanel counter, including the stocky, heavyset man, were using a credit card in the name of Yeun Man Sing.

Furthermore, Agent Cachinero saw what appeared to him to be a handoff from the man making the purchase at the Chanel counter to the stocky man, who then left. In addition, after viewing the videotape, he confirmed with the sales clerk at Tourneau that the man using the Yeun Man Sing credit card was the same man who had attempted to victimize Tourneau a few days earlier.

When Agent Cachinero got to Versace, he saw Sun, Tam, and Li in the company of the stocky, heavyset man from the Chanel counter. A reasonable inference that he could draw, *see Clark,* 559 F.2d at 424, was that Sun, Tam, and Li knew both men who had been at the Chanel counter. When he positioned himself next to Sun, he noted that the name on the credit card Sun was using was Johnson P.K. Ho, the same name on the card used at the Vuitton counter at Saks. Thus, Agent Cachinero could reasonably infer that

all seven men knew each other and were working together, especially given what he knew about an organized Asian group victimizing high-end stores.

Agent Cachinero noticed that the credit card Sun presented was suspicious even discounting the fact that it was in the name Johnson P.K. Ho; the "flying V" was not embossed correctly. In addition to watching Sun complete the transaction, Agent Cachinero also saw Tam browsing through the merchandise in the store, talking to Li and holding up a shirt as if to select it. The clerk from Versace also testified that Tam himself made a purchase. Far from being passive bystanders, the two seemed to be taking an active role in shopping. Additionally, Agent Cachinero saw the stocky, heavyset man talking with all three defendants both inside and outside of Versace. Finally, in Oxygene, Agent Cachinero again saw Sun sign a credit card receipt, this time with Li and Tam standing right next to him.

At this point, Agent Cachinero certainly had enough information to have formed a reasonable suspicion that the men knew each other, and that they were using counterfeit or unauthorized credit cards. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Defendants concede that their challenge to the *Terry* stop is weak at best. Even if they did not concede this, however, Agent Cachinero had more than enough information from his investigation, his prior knowledge, and his investigatory expertise to warrant a *Terry* stop of the defendants.

■ During his investigatory questioning, Agent Cachinero asked Sun, Li, and Tam for identification. Sun produced several credit cards in the name of Johnson P.K. Ho as well as a California driver's license in that name. As Agent Cachinero had already noted, this "Johnson P.K. Ho" was not the same "Johnson P.K. Ho" making purchases at the Vuitton counter at Saks. Furthermore, the picture on the license was not that of Sun. Also, the license Sun produced was typed rather than computer-generated, strikingly similar in that respect to the Kee Lee license that Agent Cachinero had recovered from Saks two weeks earlier.

When he searched Sun's wallet with Sun's permission (given in a conversation with Agent Cachinero in English), Agent Cachinero saw three credit cards, all of which he determined to be counterfeit. At this point at the very latest, Agent Cachinero had probable cause to arrest Sun.

The other defendants had produced apparently valid identification in response to Agent Cachinero's request. Once he determined that Sun's cards were indeed counterfeit, however, Agent Cachinero also had probable cause to arrest Tam and Li.

From the totality of his observations that evening, *see Clark,* 559 F.2d at 424, Agent Cachinero had reasonably inferred that Sun, Tam, and Li were working together as part of a larger group. Specifically, he saw both Tam and Li accompany Sun from store to store as he made purchase after purchase with counterfeit credit cards. Also, they were actively shopping in Versace, looking for merchandise to buy, and Tam made a purchase himself. All three were seen talking to the stocky, heavyset man who was acting as the lookout in Versace, indicating that they knew him as well and were shopping together as a group. *Cf. United States v. Barber,* 557 F.2d 628, 631–32 (8th Cir.1977) (mere association with criminal or presence during criminal activity insufficient to establish probable cause); *United States v. Seay,* 432 F.2d 395, 400 (5th Cir.1970) (mere presence at scene of crime, with nothing more, not enough to establish probable cause); *United States v. Viera,* 569 F.Supp. 1419, 1425–26 (S.D.N.Y.1983) (same).

■ Furthermore, Agent Cachinero could reasonably have inferred that they also knew Ching, Qiu, and Yeun Man Sing. Although association with someone engaged in criminal activity is not in itself sufficient to establish probable cause, it is a factor that should be considered in the probable cause calculus. *See, e.g., United States v. Hillison,* 733 F.2d 692, 697 (9th Cir.1984) ("One important consideration ... is whether the known criminal activity was contemporaneous with the association..... Another is whether the nature of the criminal activity is such that it could not normally be carried on without the knowledge of all persons present.") (citations

omitted). In this case, Agent Cachinero was well within the bounds of reason to infer that defendants Tam and Li not only accompanied Sun to the mall, but were actively helping him make large purchases with fraudulent credit cards. Presumably they knew Sun's real name. Since he signed the Oxygene receipt with them standing there watching him, it is reasonable to infer that they knew that he was using a fake credit card. Although Tam argues that he neither speaks nor reads English, Agent Cachinero could not know that at the time. Li does read and speak English. Based on all of the circumstances known to Agent Cachinero, the arrest of defendants Tam, Li, and Sun was based on probable cause and was therefore a fully lawful arrest.

*Searches incident to the lawful arrest*

There were six searches and/or seizures incident or subsequent to the defendants' arrest. They are the initial inventory search during which the valet ticket was found on Li; the initial search of Li's car; the search of the police car; the questioning of the defendants with respect to the address book found in the police car; the second search of Li's car; and the search of the hotel rooms. Li's statements the next day will be dealt with separately.

All of the evidence that is the subject of this motion was obtained as a result of the arrest of Sun, Tam, and Li. Since the Court has determined that arrest to have been lawful as based on probable cause, the challenge to any evidence because it is the fruit of an unlawful arrest must fail. *See Weeks v. United States,* 232 U.S. 383, 392, 34 S.Ct. 341, 344, 58 L.Ed. 652 (1914) (recognizing validity of warrantless search incident to lawful arrest).

*The inventory search of Li and the search of the police vehicle*

■ The two searches for which the above analysis is dispositive are the inventory search of Li and the search of Officer Cubela's police cruiser. Both searches were searches incident to a lawful arrest and therefore valid. *See Illinois v. Lafayette,*

462 U.S. 640, 644–46, 103 S.Ct. 2605, 2608–09, 77 L.Ed.2d 65 (1983) (inventory search); *United States v. Maryland,* 479 F.2d 566, 568 (5th Cir.1973) (search of police vehicle).

■ With respect to the search of the police car, the address book, safe key, credit cards, and receipts were found tucked behind and into the backrest. In their papers, the defendants contended that the items "fell out of the pocket" of one of them. At the hearing on their motion, Tam testified that he had the items and purposely hid them so that the police would not find them. Therefore, only Tam would have standing to challenge the search of the police car.[7] *Jones v. United States,* 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697 (1960). (Similarly, only Li would have standing to challenge the inventory search and the seizure of the valet receipt.) As to the other defendants, the key, book, and other items are admissible.

■ Yet these items are admissible even against Tam. It is the law in this Circuit that, if an arrest is lawfully made, "the abandonment [in the police car of items belonging to the defendants] [is] clearly voluntary.... a lawful arrest does not in itself amount to such compulsion as will render an otherwise voluntary abandonment involuntary." *United States v. Maryland,* 479 F.2d at 568, citing *Abel v. United States,* 362 U.S. 217, 240–41, 80 S.Ct. 683, 697–98, 4 L.Ed.2d 668 (1960). Therefore, the seizure of the valet ticket from Li during the inventory search and the seizure of the book, key, credit cards, and receipts from the police car were both valid, and the items seized are admissible against all of the defendants.

*The initial search of Li's car*

The government concedes that the search of Li's car in the parking lot of the Sheraton Bal Harbor was not incident to his arrest since the car was not in the vicinity of the arrest. *See Chimel v. California,* 395 U.S. 752, 763–64, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). The government asserts that the search was nevertheless legal because of the

---

7. Because the arrest was lawful, the issue of standing need not be addressed at any length.

*See United States v. Smith,* 930 F.2d 1081, 1085 (5th Cir.1991).

mobile nature of the automobile and the lower expectation of privacy in a car.

■ Government agents may conduct a warrantless search of an automobile if there is probable cause to believe that the vehicle contains contraband or other evidence of a crime and if the search is made necessary by exigent circumstances. *Chambers v. Maroney,* 399 U.S. 42, 50–52, 90 S.Ct. 1975, 1980–81, 26 L.Ed.2d 419 (1970); *United States v. Alexander,* 835 F.2d 1406, 1409 (11th Cir. 1988). This is so because a car can quickly be driven out of the jurisdiction, thereby thwarting law enforcement efforts. *Carroll v. United States,* 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925); *see California v. Carney,* 471 U.S. 386, 389–91, 105 S.Ct. 2066, 2068–69, 85 L.Ed.2d 406 (1985) (reaffirming *Carroll* ). Furthermore, people have a lower expectation of privacy in their cars than in their homes or offices. *South Dakota v. Opperman,* 428 U.S. 364, 367–68, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976).[8]

■ Li had clearly lied to Agent Cachinero when he told the agent that he had taken a bus to the mall, since the hotel is across the street from the mall and Li had parked his car in the hotel parking lot. When Agent Cachinero obtained the receipt during Li's inventory search, he was uncertain about who had access to the car.

The normal procedure when using valet parking is to give the car and keys to a valet attendant, who will only return the car to someone in possession of the receipt. The keys may either be kept by the valet or left in the car. Thus, anyone who can distract the valet attendant or find the car may be able to drive off with it even without the receipt.

Agent Cachinero could reasonably believe that there were at least seven members of the group with which Li was working: the three he had arrested; the stocky, heavyset man; the man using the Yeun Man Sing credit card; and Qiu and Ching, the men at the Vuitton counter. Four of the suspects were still at large on the night of January 28. Any one of them could have had access to the car. In addition, it was reasonable for Agent Cachinero to believe that the car could have contained evidence of wrongdoing; since it was parked across the street, it would not have been impermissible to infer that packages or other credit cards may have been in it.

Because of the inherent mobility of the car, the fact that several suspects were still free, and the reasonable possibility that the car contained evidence of wrongdoing, the police were justified in searching the car without waiting for a warrant. *United States v. Parrado,* 911 F.2d 1567, 1571 (11th Cir.1990); *see Cody v. Dombrowski,* 413 U.S. 433, 441–42, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973); *Alexander,* 835 F.2d at 1410.

■ In addition, even if the initial search of the car was illegal, the subsequent consent to search, given voluntarily by Li later in the morning, ratified the earlier search. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973). This is a logical extension of the "inevitable discovery" exception to the exclusionary rule laid down in *Nix v. Williams,* 467 U.S. 431, 447, 104 S.Ct. 2501, 2510, 81 L.Ed.2d 377 (1984) ("if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury . . . ."). *See also United States v. Khoury,* 901 F.2d 948, 959–60 (11th Cir.1990) (affirming 11th Circuit's adoption of *Williams*).

The reason for the inevitable discovery exception is that the defendant will not have suffered any prejudice from the illegality, since the evidence would have been discovered in the course of the legal investigation. Let us assume for the moment that the agents did not search Li's car when they first went to the parking lot, but merely took the keys and secured the car so that no one else could take it. When they returned with Li later that morning, they asked him for his consent to search the car, which he gave

---

**8.** This is illustrated, for example, by the requirement of mandatory car registration in every state, indicating a heightened governmental interest in the use of cars.

voluntarily. *The agents would have found all of the items that were seized in the allegedly illegal search.* This is exactly the sort of prejudice to the government that the inevitable discovery exception was crafted to avoid.

The independent source doctrine, *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), also comes into play. The Secret Service had all the information it needed to obtain a warrant to search Li's car before the warrantless search was conducted. The evidence seized from Li's car would therefore have been discovered independently. Li's consent was not obtained based on the evidence seized in the first search of his car; even without that evidence, the agents had ample reason to ask Li to consent to the search. "The right to search the [car] ... came from the consent to search, which is clearly independent from what [the agents] learned from the [warrantless search]." *United States v. Osorio,* No. 89–700, at 17 (E.D.N.Y. Jun. 4, 1990) (Mishler, J.); *see Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) (4–3 decision). Here, the inevitable discovery exception and the independent source doctrine work together to validate the warrantless search of Li's car.

Since Li's consent was freely given, and cured any defect in the initial search, Tam cannot complain that the search was still unlawful with respect to him, or that Li could not give permission for the agents to search the sun visor over the passenger seat. Even if Tam had equal control over the car (a dubious assumption, since the car was rented in Li's name with Li's credit card), it is reasonable to recognize that the "complaining co-user had assumed the risk that the consenting co-user might permit the search." *United States v. Smith,* 930 F.2d 1081, 1085 (5th Cir.1991); *see United States v. Matlock,* 415 U.S. 164, 170–71 & n. 7, 94 S.Ct. 988, 992–93, & n. 7, 39 L.Ed.2d 242 (1974) (consent of one possessing common authority over premises or effects valid against nonconsenting person); *United States v. Dunkley,* 911 F.2d 522, 525–26 (11th Cir.1990) (extending *Matlock* to search of vehicle).

Under any theory, the search of Li's car was a valid search, either as a search made in exigent circumstances incident to a lawful arrest, or because Li's aftergiven consent ratified the earlier search. In any case, the defendants' challenge to this search also fails.

*The jailhouse statements of the defendants*

The government represented that it would not introduce any of the defendants' pre-arrest statements in its case in chief. Under *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the government may use those statements to impeach the defendants if they take the stand.

Sun's exclamation of "Huh-oh" in the holding cell upon seeing the address book, however, is another story. Since that was a spontaneous utterance not given in response to any interrogation, it is admissible. *See United States v. Washington,* 431 U.S. 181, 187, 97 S.Ct. 1814, 1818, 52 L.Ed.2d 238 (1977) ("far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable."); *Cannady v. Dugger,* 931 F.2d 752, 754 (11th Cir.1991) ("Voluntary and spontaneous comments by an accused, even after *Miranda* rights are asserted, are admissible evidence if the comments were not made in response to government questioning.").

After hearing Sun's spontaneous utterance, Agent Cachinero asked Sun whether the address book was his; Sun responded and told him that it was not. Agent Cachinero asked the other defendants, who similarly denied that the book was theirs. These questions were improper custodial interrogation, and they and the responses to them are inadmissible.

*The search of the rooms at the Sheraton Bal Harbor*

Citing *United States v. Stoner,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), and *United States v. Torres,* 705 F.2d 1287 (11th Cir.1983), defendants argue that the occupant of a hotel room has a legitimate expectation of privacy "[n]o less than a tenant of a house, or the occupant of a room in a boarding house". *Stoner,* 376 U.S. at 489, 84 S.Ct. at 893. Therefore, they say, the war-

rantless search of Rooms 536, 532, and 506 was unlawful, and the fruits of that search must be suppressed.

■ In general, the statement from *Stoner* is correct. These defendants, however, can not benefit from the general rule given the facts of this case. There are at least three alternative rules of law that militate against the defendants' position. First, the defendants could be considered guests of Dr. Hangoc, merely present in rooms that were rented by him. *See United States v. Grandstaff,* 813 F.2d 1353, 1357 (9th Cir.1987); *United States v. Carr,* 939 F.2d 1442, 1444–45 (10th Cir.1991). Second, since they were using Dr. Hangoc's credit card without permission, the rooms were obtained fraudulently, and the defendants had no reasonable expectation of privacy in them. *Cf. United States v. Carter,* 854 F.2d 1102, 1105–06 (8th Cir.1988) (whether defendant checked into, kept personal belongings in, and paid for room are factors in determining expectation of privacy). Finally, since the search did not take place until well after noon (in fact it was after 3:00 p.m., the late check-out time), possession of the rooms had reverted to the hotel, which was thus within its rights to authorize the Secret Service to search them. *Cf.* FLA.STAT.ANN. § 509.402 (West 1988). In no case can the defendants show that they had a legitimate expectation of privacy in any of the rooms.

### 1. Defendants as guests of Dr. Hangoc

■ Mere presence in a hotel room registered to another does not establish the requisite expectation of privacy. In *Grandstaff,* the Ninth Circuit held that a guest of the registrant of the room had no standing to challenge a warrantless search of the room. He had not stayed in the room, nor had he left any personal belongings there. Consequently, he had no legitimate expectation of privacy in the room. *Grandstaff,* 813 F.2d at 1357. And in *Carr,* the Tenth Circuit upheld a warrantless search of a motel room because the defendant established only that he occu-

pied the room, not that it was registered him or that he shared it with the person who had registered it. *Carr,* 939 F.2d at 1446.

■ In this case, the room was registered to a third party, Dr. Hangoc, and guaranteed by a credit card in his name. Even assuming that the use of Dr. Hangoc's name and card were authorized, the defendants left no personal belongings in the room. Where a defendant has neither registered nor paid for the room himself, and has left no personal belongings in the room, he has not established a legitimate expectation of privacy in the room. "Important considerations in the expectation of privacy equation include ownership, lawful possession or lawful control of the premises searched." *Carr,* 939 F.2d at 1446; *see Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Without that expectation, they do not have standing to challenge the search, notwithstanding their testimony that they actually stayed in the rooms and intended to return.[9] Furthermore, even if the court were to find standing to challenge the search of the safe in Room 506, only Tam and Sun, who testified that only they had access to the safe and a possessory interest in its contents, would have that standing. The evidence found in the safe would still be admissible against Li, Ching, and Qiu.

### 2. Defendants as fraudfeasors

■ Upon being contacted by the Secret Service, Dr. Hangoc denied using or permitting someone to use his credit card at the hotel. The use of an unauthorized or counterfeit credit card to rent the rooms is a felony. FLA.STAT.ANN. § 509.151 (West 1988). Also, leaving a hotel room without intending to return, leaving indicia of that intent, or paying for the room, is abandonment of that room and any right to privacy in it. *See, e.g., Carter,* 854 F.2d at 1105–06. Despite the fact that defendants were in custody at the time and could not return even if they had intended to do so, it was their actions at the outset in renting the

9. This testimony was undercut by Ching's testimony that he spent the night at a hotel other than the Sheraton Bal Harbor. Ching presumably did not know of the arrests, and would have returned to the Sheraton if he, or any of the others, had intended to spend more than one night there.

rooms that led to the termination of their occupancy and their constructive abandonment of them. *See United States v. Ramirez*, 810 F.2d 1338, 1341 n. 3 (5th Cir. 1987); *United States v. Haddad*, 558 F.2d 968, 975 (9th Cir.1977); *United States v. Cowan*, 396 F.2d 83 (2d Cir.1968). Society should not recognize an expectation of privacy in a hotel room obtained fraudulently, and we do not believe that such an expectation is legitimate or reasonable.

In *Cowan*, the defendant did not pay for his hotel room for five days. The hotel plugged the lock on the door and removed Cowan's luggage. The police arrived to question Cowan in an investigation, and a hotel representative told them about the luggage and gave it to them. The Second Circuit agreed that the defendant had lost his right to privacy in the luggage by failing to pay for his room. *Cowan*, 396 F.2d at 86–87.

Once the Sheraton found out that the rooms were guaranteed with a fraudulent credit card, it had every right to terminate the occupancy of the rooms occupied by the defendants. FLA.STAT.ANN. § 509.402 (West 1988). A defendant "ha[s] no reasonable expectation of privacy with respect to a room from which he ha[s] been *justifiably* ejected." *Haddad*, 558 F.2d at 975 (emphasis added). In addition, the lack of any personal belongings in any of the rooms, unlike the defendant's room in *Cowan*, bolsters the finding of abandonment. *Carter*, 854 F.2d at 1105. The court finds Tam's testimony that he left a travel bag filled with clothing in Room 506 incredible in light of persuasive competent evidence to the contrary. The defendants abandoned any legitimate expectation of privacy the moment they attempted to perpetrate a fraud.

### 3. It was after check-out time

Even if their use of a fraudulent credit card is ignored and their occupancy of the rooms on the 28th would be enough to confer standing, the defendants' challenge must fail.

Despite the defendants' testimony that they intended to register for three days and in fact did so, the court finds the testimony of Brian Elduff credible to establish that Rooms 506 and 536 were rented for one night, the 28th, and Room 532 was rented for two nights, the 28th and 29th.[10] The fact that a guest tried to check in to Room 506 on the afternoon of the 29th confirms this.

Elduff also testified that normal check-out time, when possession reverts to the hotel, is noon. The search took place at about 3:45 p.m. on January 29, well after the noon check-out time. Thus, the hotel was in possession of at least Rooms 506 and 536 and could give permission to search them. Even had the hotel granted late check-out privileges, such privileges do not extend past 3:00 p.m. Even if the hotel were forced to extend late check-out privileges for purposes of consenting to a warrantless search, which may be advisable in order to vindicate fully guests' Fourth Amendment rights, the search of the rooms took place after 3:00. Only the search of Room 532 is invalidated by this line of reasoning, and the defendants are not in this proceeding challenging the admissibility of anything found in the search of Room 532. Nor did that search lead to the search of Room 506.

The warrantless search of each hotel room was reasonable under any view of the evidence. In no case did the defendants have a legitimate expectation of privacy. Since such an expectation is required to trigger Fourth Amendment protection, the police did not require a warrant and the search was valid. The motion to suppress the items found in the safe in Room 506 is denied.

*Li's statements at his house*

Li seeks to suppress statements he gave to Secret Service agents at his house the day after his arrest. Li had been read his *Miranda* rights twice at the Bal Harbor police station, and the agents read them to him again immediately before questioning him outside his house.

10. The defendants would like to rely on the fact that someone made the notation "28, 29, 30" on an imprint on the back of the registration card for Room 506. However, Elduff offered a convincing explanation for the notation. Further, the notation was made in the area of the registration card reserved for the credit card imprint— an unlikely place for a contemporaneous notation of the length of the stay.

Contrary to Li's assertion, he did not invoke his right to counsel before he was asked to sign a written statement; he invoked his right to remain silent. *See Michigan v. Mosely,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (distinguishing right to remain silent and right to counsel, setting down guidelines for right to remain silent). Agent Cachinero testified that, after *Miranda* warnings had been given, Li was asked to empty his pockets. When Agent Cachinero picked up the receipt and asked Li if it was for his car, Li just looked down and did not respond. At that point, the authorities were required to cease questioning "but [could] resume the interrogation at some later time." *United States v. Bosby,* 675 F.2d 1174, 1182 (11th Cir.1982) (*citing Mosely,* 423 U.S. at 100–03, 96 S.Ct. at 324–26).

Agents Kalb and Hernandez re-*Mirandized* Li outside his home on the 29th before they began to question him (other than to ask if he would accompany them to the field office and to ask him to speak to them there). After hearing the warnings for a third time, Li voluntarily agreed to speak with them. The voluntariness of Li's statements is shown in several ways. He controlled the location of the interview—he refused to accompany the agents to the field office, but agreed to talk to them outside his home. He did not in fact sign the written statement until conferring with his attorney. He had also previously signed a consent to search his car. *See, e.g., United States v. Vera,* 701 F.2d 1349, 1364 (11th Cir.1983) (voluntariness determined from examining all surrounding circumstances); *cf. United States v. Arango,* 853 F.2d 818, 824 (11th Cir.1988) (that defendant left warehouse on his own indicated voluntariness of subsequent confession).

Li told the agents about a Mr. Sing and about the arrangement he had with Sing, Tam, and Sun. Only after they asked if he would sign a written sworn statement did Li say that he wanted to talk to his attorney before he wrote anything. At that point, the agents immediately discontinued the interview. *See Bosby,* 675 F.2d at 1182 (*citing Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981)). Li's statements were not obtained in violation of any of his rights, and they are therefore admissible.

### CONCLUSION

The initial arrests of Tam, Sun, and Li were supported by adequate probable cause with respect to each defendant. The inventory search at the police station and the search of the police car were incident to the lawful arrest. In any case, only Li has standing to object to the inventory search, and only Tam has standing to object to the search of the police car. The statements made by the defendants in response to questions about the address book were improperly adduced and must be suppressed.

The first search of Li's car was justified by the exigency of the situation and was ratified in any event by Li's later signing of the consent to search, which of course justified the second search of the car. In both cases, only Li and Tam have standing. The warrantless search of the hotel rooms was proper under any circumstances—it was past check-out time, the rooms had been obtained fraudulently, and as guests of the "true" renter, Dr. Hangoc, the defendants had a limited expectation of privacy. Only Sun and Tam have standing here, if indeed even they do. Finally, Li's statements at his home on January 29 were lawfully obtained; in any event, only Li has standing to challenge them.

### *ORDER*

The defendants' motions to suppress are DENIED in their entirety, except that the motion with respect to the statements made by defendants in the police station in response to questioning about ownership of the address book found in the police car is GRANTED, and it is

SO ORDERED.