**UNITED STATES of AMERICA, Plaintiff**
**v.**
**GUSTAVO DIAZ, JORGE GONZALEZ, DANIEL COTTO, and**
**LUIS FERNANDO LLONA, Defendants**

Crim. Nos. 1998-42 & 1998-43

District Court of the Virgin Islands

Division of St. Thomas and St. John

September 10, 1998

SARAH L. WEYLER, ESQ., Ass't United States Attorney, *for plaintiff*

STEPHEN A. BRUSCH, ESQ., Dudley, Topper & Feuerzeig, St. Thomas, *for Gustavo Diaz, defendant*

PATRICIA SCHRADER-COOKE, ESQ., Ass't Federal Public Defender, *for Jorge Gonzalez, defendant*

STYLISH WILLIS, ESQ., *for Daniel Cotto, defendant*

LEMUEL CALLWOOD, ESQ., *For Luis Fernando Llona, defendant*

MOORE, *Judge*

## MEMORANDUM

This matter is before the court upon defendants' various pre-trial motions. Defendant Gustavo Diaz ["Diaz"] has moved for reconsideration of this Court's order denying his motion to dismiss on grounds of double jeopardy. *See United States v. Diaz*, No. 1998-42, at 7 (D.V.I. May 7, 1998) (unpublished opinion). He has also moved to suppress statements made and items seized subsequent to his arrest as well as to suppress a subsequent photographic identification made by his alleged victims. Defendant Jorge Gonzalez

["Gonzalez"] has joined Diaz' motion to suppress the photographic identification. Defendants Claudio Cotto ["Cotto"] and Luis Llona ["Llona"] have moved for suppression of evidence seized from their hotel rooms subsequent to their arrest. After an evidentiary hearing on June 10-11 and June 17, 1998, and for the reasons set forth below, the defendants' motions will all be denied.[1]

This Court has general criminal jurisdiction equivalent with that of a district court of the United States under the Revised Organic Act of 1954 ["Rev. Org. Act"] § 22(a), 48 U.S.C. § 1612(a).[2] The Court has specific cognizance of this case as the defendants have been charged by indictment with numerous counts of fraud in the use of access devices, a violation of 18 U.S.C. § 1029.

## I. MOTION TO RECONSIDER COURT'S DENIAL OF DISMISSAL

Defendants were arrested and charged with numerous counts of credit card fraud in violation of Virgin Islands law. 14 V.I.C. § 3003(f) (making fraudulent cards) and § 3004 (obtaining property by use of a fraudulent card). A second information filed February 17, 1998, lodged twenty-seven counts of fraud against the defendants. At a February 19th bail hearing, the Presiding Judge of the Territorial Court, Verne A. Hodge, recognized that the bail provisions of the Virgin Islands, as construed by the Appellate Division of this Court,[3] mandated that he set bail in an amount and with conditions which the defendants reasonably could satisfy. The Presiding Judge advised that an order setting bail for the defendants would be ready the next day, February 20th, a Friday.

When it became clear that the defendants were going to be released on bail by the Presiding Judge, the Assistant Attorney General ["AAG"] of the Virgin Islands Department of Justice

---

[1] This memorandum supplies the reasoning on which the Court issued its written order denying all motions on August 27, 1998. Three of the four defendants pled guilty and were sentenced late on August 27, 1998. Final disposition of the charges against defendant Jorge Gonzalez remains pending.

[2] The complete Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541-1645 (1994), *reprinted* in V.I. Code Ann., Historical Documents, Organic Acts, and U.S. Constitution at 73-177 (1995 & Supp. 1997) (preceding V.I. Code Ann. tit. 1) ["Rev. Org. Act"].

[3] *Karpouzis v. Gov't of the Virgin Islands*, 36 V.I. 132, 961 F. Supp. 841 (D.V.I. App. Div. 1997).

prosecuting the case in the Territorial Court conferred with the Assistant United States Attorney ["AUSA"] with whom he had been working, inasmuch as the Virgin Islands Department of Justice and the United States Attorney had been jointly working the case,[4] and a decision was made to proceed against them in federal court. The AAG was concerned that the defendants, being Argentine nationals with no ties to the Virgin Islands, were a substantial flight risk. The AUSA obviously agreed, for on February 27, 1998, the United States Attorney filed a criminal complaint in this Court charging the defendants with federal offenses under 18 U.S.C. § 1029(a) (fraud in the use of an access device).[5]

On March 6th, ten days after the federal complaint was filed, counsel for Diaz filed a motion in Territorial Court to dismiss the territorial charges with prejudice, alleging collusion between the prosecutors to frustrate that court's decision to admit the defendants to bail. Shortly thereafter, the AAG moved to dismiss the local information without prejudice. The Presiding Judge held a hearing on these motions on April 16th, at which Judge Hodge severely criticized the AAG for running to the United States Attorney in an effort to keep the defendants in custody. Believing it necessary to protect the jurisdictional prerogatives of his court, the Presiding Judge dismissed the territorial information against these defendants with prejudice.

On April 22, 1998, Stephen A. Brusch, retained counsel for defendant Diaz, filed in this Court his "Motion to Dismiss with Prejudice the Indictment Because the Double Jeopardy Clause of the Fifth Amendment Prohibits this Second Prosecution," ["Diaz' Fifth Amendment Motion"]. The entire basis for the motion is contained in the following paragraph.

> As reasons for the Motion, Mr. Diaz avers that the government, through its "left arm," the Virgin Islands

---

[4] Transcript of April 16, 1998, Hearing in Territorial Court at 26-27, attached as Exhibit 6 to Diaz Memorandum.

[5] Upon the defendants' release from the territorial charges, they were taken into federal custody and transported to the federal detention center at Guaynabo, Puerto Rico and remained in federal custody until released by Magistrate Judge Barnard's order of May 8, 1998. The federal grand jury returned a true bill of indictment against the defendants on March 19, 1998.

Department of Justice prosecuted Mr. Diaz and co-defendants Jorge Gozalez, Luis Fernando Llona, and Daniel Cotto in the Territorial Court of the Virgin Islands for offenses arising out of the same acts and transactions as this District Court case. . . . On April 16, 1998, the Territorial Court **Dismissed with Prejudice** that case because of the government's vindictive prosecution of the defendants and circumvention of the Territorial Court's Order releasing the defendants. The government, through its "right arm," the United States Attorney, violated the Double Jeopardy Clause and the Revised Organic Act by prosecuting the defendants in the District Court for offenses arising out of the same acts and transactions. . . . Mr. Diaz respectfully requests an Emergency Hearing on this Motion.

(Diaz' Fifth Amendment Motion at 1-2) (citing to the Territorial Court case with a *"Cf."* to *Robinson v. Schneider*, 893 F. Supp. 490 (D.V.I. 1995)) (emphasis in original).

In an opinion dated May 7, 1998, this Court denied the motion without a hearing, because it was crystal clear that no jeopardy had ever attached in the Territorial Court and the Double Jeopardy Clause was not implicated. Although counsel for Diaz has agreed that the sole basis for his motion to dismiss was without merit, he raised new issues in a motion for reconsideration. Mr. Brusch then used these totally new arguments to assert that this Court nevertheless "committed a plethora of manifest errors of law and of fact" in its May 7th opinion.

This Court must now correct those error [sic] unless it envisions itself to be a willing participant in the government's manipulation to violate the defendant's rights and the Territorial Court's jurisdictional integrity. This Court must now correct those errors unless it cares not that the scholarly and intellectual eloquence of it prior decisions be shattered upon the rocks of indifference. . . .[6] This

---

[6] Mr. Brusch here hurled another assault on this Court, which is so baseless that it hardly deserves discussion:

Court must now correct those errors unless it is ready to be the hideout for prosecutors who desire to circumvent the order of [sic] Territorial Court judge and the decision of the Appellate Division of the District Court.

(Memorandum of Law in Support of Defendant Gustavo Diaz' Motion for Reconsideration of the Court's Order Denying Diaz' Motion to Dismiss with Prejudice ["Diaz Memorandum"] at 1.)

In one short paragraph, defense counsel has repeatedly assaulted this Court's moral and intellectual integrity. Counsel stated that this Court has wilfully violated the defendants' rights and the Territorial Court's jurisdiction, that this Court is intellectually dishonest and indifferent, and that this Court has lawlessly ignored binding Appellate Division precedent. Counsel's accusation that this Court has become a haven or "hideout" or conspirator with the prosecution to avoid an order of the Chief Judge of the Territorial Court was amplified by the further charge that the "District Court simply mimicked the United States Attorney's misconstruing of the facts." (Diaz Memorandum at 13.)

These are strong and intemperate statements, even if they were true. They are disrespectful and unprofessional in the extreme, if

---

This Court must now correct those errors unless it is willing to ignore entrenched statutes such as the Full Faith and Credit Act, 28 U.S.C. § 1738, and settled doctrines such as the *Rooker-Feldman* doctrine, that prevents a party who loses in a territorial or state court from have a "second bite at the apple" in a federal district court.

The frivolity of the § 1738 assertion is manifest from the number of federal prosecutions following state prosecutions growing out of the same events, even after an acquittal in state court. *See e.g., United States v. Koon*, 34 F.3d 1416, 1439 (9th Cir. 1994) (federal prosecution on criminal civil rights violations following acquittal of state law assault charges did not violate double jeopardy even where federal prosecution arises from same factual nexus), *aff'd in part and rev'd in part, Koon v. United States*, 515 U.S. 1190, 132 L. Ed. 2d 920, 116 S. Ct. 39 (1995). Even assuming the Act applies to criminal cases, this Court has done nothing to affect Judge Hodge's dismissal of the territorial charges, which was not an adjudication on the merits, Diaz and his co-defendants are only charged with federal offenses in this Court. It is thus absurd for counsel to state that this Court "would effectively be vacating the decision of the Territorial Court" if it allows this federal prosecution to proceed. (Diaz Memorandum at 20.)

Counsel's *Rooker-Feldman* argument is almost too silly to waste time rejecting. Mr. Brusch asserted that by allowing the United States Attorney to file federal charges after the Territorial Court was about to admit the defendants to bail on the territorial offenses and by allowing the federal prosecution to continue after the Territorial Court dismissed the territorial case with prejudice, the Trial Division of this Court exercised appellate review of the Presiding Judge's release and dismissal orders. The mere statement of the proposition is sufficient to demonstrate its utter frivolity.

not contumacious, if untrue. Therefore, the Court will examine Mr. Brusch's accusations to determine the accuracy and applicability of each.

Counsel claims that this Court acted precipitously in denying his motion to dismiss — that "the District Court could not, and did not 'think through' the issues presented in this case." (Diaz Memorandum at 18.) Mr. Brusch conveniently overlooks his urgent request for an "emergency hearing" and then complains when the Court ruled promptly on his motion. In again so readily impugning this Court's diligence, intelligence, and intellectual integrity, counsel ignores his abandonment of the sole basis for his motion to dismiss, namely his concession that "the double jeopardy clause adumbrates but does not compel the dismissal of the Indictment" here. (Diaz Memorandum at 16.) Since counsel now agrees that the only legal basis asserted in his motion to dismiss was groundless, one might conclude that it was Mr. Brusch who "could not, and did not 'think through' the issues presented in this case."

Again, defendant Diaz' motion, the denial of which he here seeks to have reconsidered, was to dismiss this case with prejudice based solely on the ground that this federal prosecution would violate the double jeopardy provision of the Fifth Amendment.[7] None of the other grounds so emotionally asserted in the motion to reconsider were mentioned in Diaz's two-page motion to dismiss,[8] even though counsel had all the information subsequently filed in this Court with the voluminous attachments to the Diaz Memorandum, including what transpired at the Territorial Court hear-

---

[7] The Double Jeopardy Clause of the Fifth Amendment is made applicable within the territory of the Virgin Islands. Rev. Org. Act § 3, 48. U.S.C. § 1561.

[8] Counsel claims that this Court did not recognize that the defendants first moved for dismissal with prejudice in the Territorial Court. Who files first for dismissal matters not for purposes of double jeopardy. The controlling factor is the absence of any determination of the merits by the Territorial Court. As noted elsewhere, the Presiding Judge dismissed the territorial charges with prejudice to vindicate and protect the integrity of his court's authority.

Counsel further accuses this Court of "'pooh poohing' Judge Hodge's reaction as simply 'expressing concern about the government's conduct." (Diaz Memorandum at 14). With the benefit of the transcript, which was filed after the May 7th Opinion, it does indeed appear that this Court did not capture the depth of the Presiding Judge's indignation. Nevertheless this Court's portrayal of Judge Hodge's reaction to the conduct of the AAG is not inaccurate, hardly constitutes an error or fact or law, and surely does not amount to manifest error or fact or law.

369

ing.[9] In urging reconsideration, counsel nevertheless insists that *Robinson v. Schneider* governs and mandates dismissal of this indictment with prejudice.

## A. Prosecution by The United States of These Federal Charges in The District Court Does Not Violate The Defendants' Rights or The Territorial Court's Jurisdictional Integrity, Nor Does it Circumvent the Appellate Division's *Karpouzis* Decision

A short recap of *Robinson v. Schneider* will be helpful. In 1993, Robinson was charged by the Government of the Virgin Islands with the territorial offense of first degree murder. The case was filed in this Court, which then had original jurisdiction over this local criminal offense, and was prosecuted by the United States Attorney. After a jury trial, Robinson was acquitted of murder but convicted of manslaughter. His manslaughter conviction was reversed on appeal and remanded to the District Court for retrial. After the elapse of sixty-two of the seventy days allotted to retry Robinson under the federal Speedy Trial Act, the United States Attorney moved to dismiss the case without prejudice on the ground that "further prosecution in this matter would not be in the best interest of justice." Most significant for present purposes, the federal statute assuring a speedy trial act does not apply to criminal prosecutions in the Territorial Court. This Court granted the motion and dismissed the case without prejudice.

By the time the United States Attorney dismissed the charges against Robinson in this Court, original jurisdiction over all Virgin Islands crimes had been vested in the Territorial Court.[10] The Virgin Islands Department of Justice then invoked this jurisdiction by prosecuting the same manslaughter charge against Mr. Robinson in the Territorial Court, which is not bound by the federal speedy trial limits. To prevent this circumvention of the

---

[9] Although the transcript of that hearing was not available when counsel filed his motion to dismiss in this Court, having been prepared on May 11, 1998, defense counsel himself knew what went on since he represented Diaz at the hearing.

[10] The District Court of the Virgin Islands retains limited concurrent jurisdiction over local offenses which arise from the same factual nexus as federal violations. REV. ORG. ACT § 22(c), 48 U.S.C. § 1612(c).

federal speedy trial rights guaranteed to Robinson, this Court converted the order from a dismissal without prejudice to a dismissal with prejudice, *nunc pro tunc*.

The essence of Mr. Diaz' present position on the applicability of *Robinson* appears to be encapsulated in this quote from the *Robinson* opinion:

> In our view, the government's actions in this case were fundamentally unfair and inconsistent with our notions of fair play and substantial justice. Moreover, they unduly prejudiced Robinson. **Certain statutory protections attach** when a criminal defendant is brought before this Court to answer **for territorial offenses**; the government may not arbitrarily strip them away by dismissing and refiling **the same charges for identical offenses** in another forum.

*Robinson,* 893 F. Supp. at 497 (emphasis added). Mr. Brusch contends that the team of local and federal prosecutors "stripped" away the defendants' right to be released on bail on the local charges brought in the name of the Government of the Virgin Islands in the Territorial Court by filing federal charges based on the same conduct in the name of the United States in District Court. Diaz' counsel would analogize this to the prosecutorial manipulation found to be sanctionable in *Robinson*. (*See* Diaz Memorandum at 17.) The problem with this analogy is that it fails to represent the true facts and obvious differences between *Robinson* and the case presently before this Court.

First of all, *Robinson* involved the exact, identical charge of manslaughter under the Virgin Islands Code being dismissed in the District Court by the Government of the Virgin Islands and immediately reprosecuted by the same Government of the Virgin Islands in the Territorial Court. Here the defendants were charged by the Government of the Virgin Islands in Territorial Court with territorial offenses and, at the same time, charged by the United States government in District Court for criminal violations of federal law growing out of the same predicate acts. Further, and most significantly, Robinson's reprosecution in Territorial Court completely deprived him of his federal statutory right to a speedy

trial, because that statute applies only in the District Court and not in the Territorial Court. Switching the prosecution of these defendants from the territorial to the United States government and the local to the federal court, however, has not deprived them of their right to be released pending trial. Indeed, Mr. Diaz and his co-defendants were released by this Court pending trial.

Under the statutes and rules of this Territory, a defendant charged with a territorial offense in Territorial Court can be detained before trial only if that offense is one of an enumerated list of "dangerous crimes."[11] *Karpouzis v. Gov't of the Virgin Islands*, 36 V.I. 132, 961 F. Supp. 841 (D.V.I. App. Div. 1997). In *Karpouzis*, the Appellate Division was required to reconcile a conflict between substantive Virgin Islands law on the right to bail and federal bail provisions made applicable by Territorial Court Rule 141. The resolution was that monetary bail for persons charged in the Territorial Court with nonviolent, nondangerous, nondrug related violations of Virgin Islands law must set at an amount they reasonably can post; bail may not be used as a subterfuge for detention.

On the other hand, the federal Bail Reform Act, 18 U.S.C. §§ 3142-50 ["BRA"], applies to all federal offenses prosecuted in this Court and allows the magistrate judge to detain persons charged with nondangerous, nonviolent federal violations, such as these defendants, unless certain conditions guaranteeing their appearance at trial can be satisfied.

> Contrary to what the law allows in the [Territorial Court of the] Virgin Islands, the judicial officer [in the District Court] setting conditions for a person charged with any federal crime, whether it could be classified as dangerous or not, can convert a pretrial release proceeding to a pretrial detention hearing under the BRA under certain circumstances.

*Karpouzis*, 36 V.I. at 142, 961 F. Supp. at 848. The Appellate Division drew upon a First Circuit Court of Appeals' opinion interpreting the legislative history of the BRA:

---

[11] *See* 5 V.I.C. § 3504a.

372

> [T]he Bail Reform Act authorizes judicial officers to order pretrial detention where no condition or combination of conditions can "reasonably assure" the defendant's presence. In other words, when the defendant cannot meet the conditions that the court thinks will reasonably assure his presence, and the court finds that less stringent conditions (which the defendant, perhaps, can meet) will not give adequate assurance, the court is entitled to conclude that detention is necessary until trial. *United States v. Mantecon-Zayas*, 949 F.2d 548, 550-51 (1st Cir.1991).

*Karpouzis*, 36 V.I. at 143, 961 F. Supp. at 849.

■ The AAG's decision to abandon the case in Territorial Court and the AUSA's decision to refile it in District Court did not deny the defendants' constitutional right to be admitted to bail, although the rules by which their release would be determined were changed. The criteria for release in the District Court are without question less favorable to defendants than those in the Territorial Court. This very understandably upset the Presiding Judge, who granted the defendant's motion to dismiss the territorial offenses with prejudice, which obviously was not an adjudication on the merits of the federal charges against the defendants in the District Court. Rather, it was an expression of the Presiding Judge's ire at the AAG's lack of respect for the Territorial Court, whose jurisdiction the Virgin Islands Department of Justice had invoked and then spurned when faced with a ruling it did not like. The prosecution of these same defendants in this Court in the name of the United States for violations of United States law neither violated the Territorial Court's jurisdictional integrity nor provided a "hideout" for miscreant and vindictive prosecutors.

### B. Prosecution by The United States of These Federal Charges in The District Court Does Not Provide a "Hideout" for Vindictive Prosecutors

Defense counsel argues that the Presiding Judge's determination that there was prosecutorial vindictiveness in removing the case from the Territorial Court applies to the United States Attorney and requires dismissal of this indictment. (Diaz Memorandum at

10-11.) Let us examine the Territorial Court's exact language. The Presiding Judge stated:

> The Court thus finds that there was prosecutorial vindictiveness involved in this particular case. We are not saying that [the AAG] acted illegally. I want to make that clear . . . . I speak of the prosecution as a team and so on.

(Transcript of April 16, 1998 Hearing ['Tr.'] at 48, attached as Ex. 6 to Diaz Memorandum.) While the Presiding Judge used the word "vindictiveness," the context makes it clear that he was not using the term in the sense of an illegal prosecution in violation of due process.[12] He specifically found that the AAG had not acted illegally, and the propriety of the actions of the AUSA were not before the Territorial Court for decision.

From the context and his own words, the Presiding Judge's motivation was to protect the jurisdictional integrity of the Territorial Court.

> [I]t seems to me here that the jurisdiction of this Court has been, in effect, trampled upon, or I would say looked on or treated with contempt by the prosecution, and it seems to me this Court has an obligation to vindicate its own authority with respect to the orders that it issues.

Tr. at 49. To the extent a sanction was required to vindicate the authority of the Territorial Court challenged by the action of the AAG, a sufficient remedy was administered when the Presiding

---

[12] A truly vindictive prosecution is illegal because it violates due process. *See, e.g., Bordenkircher v. Hayes,* 434 U.S. 357, 360-61, 54 L. Ed. 2d 604, 98 S. Ct. 663 (1978) (prosecutors may not act vindictively in the conduct of plea negotiations); *Blackledge v. Perry,* 417 U.S. 21, 28-29, 40 L. Ed. 2d 628, 94 S. Ct. 2098 (1974) (bringing more serious charge following criminal defendant's invocation of right to trial *de novo* held *per se* unconstitutional); *United States v. Fulford,* 825 F.2d 3, 9 (3d Cir. 1987) (federal prosecution may proceed if federal prosecutor did not participate in state prosecutor's allegedly vindictive action against defendant); and, *United States v. Oliver,* 787 F.2d 124, 125 (3d Cir. 1986) (due process violated if prosecutor brings more serious charge against a defendant who successfully exercises right of appeal or to collaterally attack prior conviction on lesser charge); *cf. North Carolina v. Pearce,* 395 U.S. 711, 725, 23 L. Ed. 2d 656, 89 S. Ct. 2072 (1969) (vindictiveness may play no part in resentencing of criminal defendant who has successfully invoked right to appeal).

Judge dismissed with prejudice the information filed by the Government of the Virgin Islands against these defendants.[13]

Even assuming that the AAG was motivated to abandon the case in the Territorial Court and give it to the AUSA to prosecute in this Court solely for the chance to keep the defendants detained under the more flexible release provisions of the BRA, there is no basis for dismissing this indictment. The Supreme Court has held that a prosecutor's pre-trial decision to raise misdemeanor charges to felony charges after a defendant asserted his right to a jury trial did not raise a presumption the prosecutor acted vindictively. *United States v. Goodwin*, 457 U.S. 368, 382, 73 L. Ed. 2d 74, 102 S. Ct. 2485 (1982). The Court emphasized that prosecutors enjoy broad discretion at the pre-trial stage to assess the societal interests of a particular prosecution and to decide accordingly.[14]

■ The United States Court of Appeals for the Third Circuit has rejected a claim of vindictive prosecution where a state prosecutor referred the firearms charges to the United States Attorney because the defendant would face stiffer penalties under the federal Armed Career Criminals Act. *United States v. Schoolcraft*, 879 F.2d 64, 67 (3d Cir. 1989). Just as with Diaz and friends, the defendant in *Schoolcraft* was first charged with local offenses in the local court. The appeals court noted that the defendant could not show vindictiveness in his federal prosecution because his charges of misconduct were directed against the state prosecutor. *Id.* at 68. Similarly, Diaz and the other defendants are discommoded, if at all, by the actions of the AAG and not the AUSA. The defendants

---

[13] What Presiding Judge Hodge did to protect the integrity of his court's processes is very much like what this Court did in *Robinson*. Dismissal with prejudice was warranted because of the deleterious impact continued prosecution of the manslaughter charge against Mr. Robinson in another forum would have on the administration of this Court's Speedy Trial Plan.

[14] Further, retaliation against the defendants must be shown for due process to be offended by the federal prosecution here. *United States v. Goodwin*, 457 U.S. at 378; *Bodenkircher*, 434 U.S. at 363 (due process violation "lay not in the possibility that a defendant might be deterred from the exercise of a legal right . . . but rather in the danger that the State might be retaliating against the accused for lawfully [exercising a right]."). First, as interpreted by the Presiding Judge, the AAG was acting in retaliation against the court's action in releasing the defendants on bail, rather than against the defendants' exercise of their right to be admitted to bail. Second, no evidence of any kind has been presented that the AUSA acted in retaliation against the defendants.

have made no showing that the decision of the AUSA to proceed against them in the District Court was motivated by anything other than the usual factors. Absent such a showing, a claim of prosecutorial vindictiveness cannot be made in this Court.

### C. General Comments on Ethics and Intellectual Honesty

Mr. Brusch is quick to cast aspersions on the motives of others and impugn the integrity, professionalism, dedication, and honesty of police officers always, prosecutors most of the time, and now the Court. It might be time for a little introspection and review of the ethical rules and standards applicable to the defense function. Counsel likes to quote ethical rules and standards to others, e.g., Stds 3-3.9(d) & 3.10(b) for the Prosecution Function from American Bar Association Standards for Criminal Justice. It might behoove Mr. Brusch to look at Std. 4-1.2 The Function of Defense Counsel, especially.

(e) Defense counsel, in common with all members of the bar, is subject to standards of conduct stated in statutes, rules, decisions of courts, and codes, canons, or other standards of professional conduct. Defense counsel has no duty to execute any directive of the accused which does not comport with law or such standards. Defense counsel is the professional representative of the accused, not the accused's alter ego.

(f) Defense counsel should not intentionally misrepresent matters of fact or law to the court.

(h) It is the duty of defense counsel to know and be guided by the standards of professional conduct as defined in codes and canons of the legal profession applicable in defense counsel's jurisdiction.

Comments are also instructive, e.g., "Defense counsel, in protecting the rights of the defendant, may resist the wishes of the judge on some matters, and though such resistance should never lead to disrespectful behavior...."[15]

---

[15] The comment that "advocacy is not for the timid, the meek, or the retiring" is omitted since present counsel hardly suffers from timidity.

Another comment makes this point:

> It is fundamental that defense counsel must be scrupulously candid and truthful in representations of any matter before a court. This is not only a basic ethical requirement but it is essential if the lawyer is to be effective in the role of advocate, for if the lawyer's reputation for veracity is suspect, he or she will lack the confidence of the court when it is needed most to serve the client.

This is echoed in Rule 3.3 of the Model Rules of Professional Conduct on Advocacy requiring Candor Toward The Tribunal: "(a) A lawyer shall not knowingly: (1) make a false statement of material fact or law to a tribunal ...." The following comment is especially pertinent, as will be mentioned later:

> Misleading Legal Argument: [3] Legal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal. A lawyer is not required to make a disinterested exposition of the law, but must recognize the existence of pertinent legal authorities.... The underlying concept is that legal argument is a discussion seeking to determine the legal premises properly applicable to the case.[16]

Particularly disturbing is counsel's deliberate misrepresentation and disingenuous argument to Presiding Judge Hodge on the obligation of the federal magistrate judge in matters of pretrial release. This could only have been a calculated effort to play one

---

[16] A review of Std. 4-7.6 Examination of Witnesses, especially (a) might also be in order regarding counsel's attempt to impeach Agent Velazquez by prior "conviction" based on a prosecution in which all, including Velazquez, were acquitted, and in which Mr. Brusch represented one of Velazquez' codefendants. In that regard Std 4-3.5(d) on Conflicts of Interest might bear review: "Defense counsel who has formerly represented a defendant should not thereafter use information related to the former representation to the disadvantage of the former client unless the information has become generally known or the ethical obligation of confidentiality otherwise does not apply." Rule 1.6(a) Confidentiality of Information of the Model Rules of Professional Conduct on Client-Lawyer Relationship, might also be implicated, in particular Comment [5], "The confidentiality rule applies not merely to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source. A lawyer may not disclose such information except as authorized or required by the Rules of Professional Conduct or other law."

court off against the other. I refer to Mr. Brusch's response to Judge Hodge's inquiry whether the federal court, in this case Magistrate Judge Barnard, would also be required to release the defendants on the federal charges. Counsel's response:

> I would argue that, Your Honor, but the Federal Court did not release them. The Federal Court put a condition that this Court on Feb 19th . . . explicitly rejected. That condition, electronic monitoring, an electronic shackle on the ankle. The Federal Court doesn't see, and I raised that issue in the Federal Court, the Federal Court doesn't see the fact that this Court released him, they should have done the exact same thing. That did not happen, and it did not happen because **I submit, Your Honor, there is a disrespect of the jurisdiction of this Court**. And, I say it is very sad. It is very sad, but it is true. What the Federal Court should have done was simply say, Judge Hodge set this Order. I am going to keep that same Order, and then I will augment, and everything will still be the same as to what the prosecutors did, but the effect will be a little bit, little bit different. It did not do so. The Federal Court gave some lip service to the Judge's Order, but it did the electronic monitoring and Mr. Diaz and the other co-defendants are still in jail, even though this Court said no electronic monitoring.

(Tr. at 7-8.) (emphasis added)

This argument to the Territorial Court was dishonest at worst and misleading at best, because it misrepresented that Judge Barnard did not respect Judge Hodge's order. On the contrary, the magistrate judge adopted virtually all the findings and monetary bail amounts of the Territorial Court's bail order, even though the federal Bail Reform Act by no means required him to do so. The only condition added was electronic monitoring. Under ordinary circumstances, and without the deference and respect given to the Territorial Court's order, Judge Barnard would have been fully justified in ordering detention under the BRA for defendants such as these who have no ties to the Virgin Islands and the obvious ability to obtain the means to flee, even if deprived of their

passports. Of all people, Mr. Brusch, who for years dealt daily with the BRA as an Assistant Federal Public Defender, knows that the federal court has much greater latitude than the Territorial Court in setting conditions of release. He knows full well that a magistrate judge can even detain defendants upon a determination that no conditions would sufficiently reduce the danger of flight and insure their appearance.

What is needed in the Virgin Islands is counsel of good faith to assist the courts and political institutions in working out the very difficult and complicated relationships between the governments of the United States and the Virgin Islands in all their aspects. This is what the United States Attorney and the local Department of Justice are striving to do. This is what the District Court and the Territorial Court and their judges are trying to do, although it is made especially difficult by the Appellate Division set up by Congress within the District Court as an interim "local" appellate court to hear appeals from the Territorial Court until the Virgin Islands Legislature establishes a truly local court of appeals. Women and men of goodwill working together to sort out these separate realms of authority and jurisdiction are what is needed, not a constant litany of knee jerk allegations of vindictiveness, deception, conniving, and emasculation of one court's order by another court.

In his argument to the Presiding Judge in support of having the Territorial Court case dismissed with prejudice, Mr. Brusch accused the prosecutors, and by complicity, the District Court, of relegating the Territorial Court "to the back of the bus." Nothing could be further from the truth. By its written opinions, this Court has interpreted the Revised Organic Act and the 1984 Amendments as expressing the intention of Congress to grant the Territory of the Virgin Islands as much independence as is possible, if not a sovereignty paralleling that of a state. This Court fully recognizes and does its best to implement the admonition Congress added to the Revised Organic Act in 1984 that the relations between the District Court and the Territorial Court "shall be governed by the laws of the United States pertaining to the relations between the courts of the United States, including the Supreme Court of the United States, and the courts of the several States ...." REV. ORG. ACT § 23, 48 U.S.C. § 1613.

Counsel argued to the Territorial Court that after a long struggle Congress has finally enabled the local legislature to establish an independent judiciary for the Territory, and the Legislature has implemented the first step in that process of transferring all local criminal and civil jurisdiction to the Territorial Court. Presumably a territorial court of appeals or supreme court is not too far off. With this, the Territorial Court of the Virgin Islands has moved to the front of the bus, where it belongs.

But there are two rows of seats at the front of the bus, one for the Territorial Court and one for the District Court. Mr. Brusch's argument that the magistrate judge was required to adopt the Territorial Court's bail order *en toto* would relegate the District Court to "the back of the bus" and disingenuously ignores the separate and independent pretrial release provisions which bind the federal court.

## II. MOTIONS TO SUPPRESS STATEMENTS, IDENTIFICATION AND EVIDENCE

The Court will now deal with the evidentiary motions. For the reasons set out below, the motions will all be denied.

### A. Relevant Facts

On January 29th of this year, Richard Velazquez, a special agent assigned to the White Collar Crime Division of the Virgin Islands Department of Justice, Office of the Attorney General, received a call from a Hazel Turnbull, the assistant treasurer for a St. Thomas retail outlet known as Little Switzerland, regarding possible credit card fraud at its Parkside store located across from Emancipation Garden. (Transcript of Suppression Hearing on June 10, 1998, ["Tr. I] at 59.) Upon his arrival at the store, Velazquez met with Barbara Crowder, the merchant banking representative for Scotia Bank. (*Id.* at 60.)

Ms. Crowder, whose duties with Scotia Bank include assisting merchants with credit card security, indicated that a Hispanic male had attempted to purchase a Rolex watch valued at about $ 4,900 from the store. (*Id.*) According to Ms. Crowder, the individual attempted to make the purchase by tendering $ 500 in cash and requesting that the balance be spread over two credit cards he

presented. (*Id.* at 61.) Clerks at the store made a copy of the Argentinian driver's license, bearing a photograph and the name "Gustavo Diaz," which the customer had surrendered as identification. (*Id.* ) They gave this photocopy to Agent Velazquez.[17]

From talking to the clerks at Little Switzerland, Velazquez learned the customer had presented two cards: one a Visa bearing the number "4599 2618 2112 0208" ["Visa 0208"] and the name "Gustavo Diaz Aguero;" the second was a Visa card with the number "4550 8700 0157 9012" ["Visa 9012"] and the name "Gustavo Diaz." (*Id.* at 66.) The customer ultimately canceled the transaction, retrieved his credit cards and left the store. Velazquez also learned the customer had told the clerks he was staying at the Renaissance Grand Hotel or the Ritz Carleton on St. Thomas. (*Id.* at 63.)

Velazquez went to the Renaissance Grand, approached the desk clerk, and identified himself as a police officer. He inquired if a Gustavo Diaz was a guest in the hotel and learned that, indeed, there was someone of that name registered in room 1113. (*Id.* at 64.) Velazquez inquired how Mr. Diaz had payed for his room and learned Diaz had tendered a third credit card, a Diner's Carte Blance bearing the number, "3640 770635 0183" ["Diner's 0183"]. (*Id.* at 67.)

Special Agent Velazquez was joined at the Renaissance Grand by Ms. Crowder; she informed him that her independent investigation revealed that one of the two Visa cards Diaz presented at Little Switzerland, Visa 9012, had proven to be fraudulent, the account number actually belonging to a Spanish national named Luis Calle Gonzalez. (*Id.* at 67-68.) Together, Velazquez and Crowder then made telephonic inquiries about the validity of the credit card Diaz had presented in payment for his hotel room as well as the other card, Visa 0208. (*Id.* at 64-65.)

They called Diner's Carte Blanche and spoke with a Ms. Karen Dent, a member of the company's U.S. security staff. (*Id.* at 69.) Ms. Dent called her counterparts in Europe, learned and then relayed to Velazquez that the card presented by Diaz, and imprinted with his name, bore the number of an account registered to a Spanish

---

[17] The photocopy was introduced at the hearing as Government's Exhibit ["Govt's Ex."] 1.

national, Gabriel M. Echegoyen Dibildos. (*Id.* at 70.) Ms. Dent faxed documentary support for this information to Ms. Crowder at the Renaissance Grand.[18]

Ms. Crowder ultimately gave Velazquez a copy of an e-mail message which had come through the Internet from employees of another retail jewelry outlet with a store in St. Thomas, Columbian Emeralds.[19] There were two parts to the e-mail as it appears to have been forwarded and text added by the recipients in turn. The first part of the message, transmitted at 6:48 p.m. on January 27, 1998, reads:

> Can you please alert the St. Marteen [sic] store or all stores about the Credit card fraud. We believe that these people are on the cruise ship (Rhapsody). They were in curacao [sic] today and purchased Rolex's from little switzerland [sic] using the same credit card number that we have in file.

> It is AX 3756-842880-21007 (Luis Aguilar). They also have Visa/MC/Diners (Gold and Platinum). The other name is Gustavo Diaz. A copy of the credit card and picture ID is being faxed to you. Please have everyone check their credit card through the floursecent [sic] or black light detector. It does not show any AX or MC logo's on it when you look through the black light. They are a big group.

> PLEASE ALERT EVERYONE!! THEY ARE PROFESSIONALS.

(Government's Exhibit ["Govt's Ex."] 2.) The second part of the message, forwarded at 8:30 p.m. on the same day reads as follows:

> Attached message is for your information. One of our staff in Aruba [ ] was suspicious when one of these cards was presented late yesterday. Whilst completing the security checks, the customer walked off and we retained the card. Purchases had been made at Little Switzerland in Aruba prior to this.

---

[18] A copy of the fax was admitted as Govt's Ex. 3.

[19] A copy of the e-mail was admitted as Govt's Ex. 2.

Advise staff to be careful because the person presenting
the card was seen to have a gun in his possession!

(*Id.*)

Velazquez was permitted to check the hotel registry and found
that a Luis Aguillar was signed into room 1213 at the Renaissance
Grand. (Tr. I at 86.) Also registered into that room was a Roberto
Garcia. (*Id.*) Velazquez checked and found the room had been paid
for by credit card, a Diner's Carte Blanche with account number
3614 803927 7018 ["Diner's 7018"]. He contacted Karen Dent a
second time and she quickly confirmed that this card too was
fraudulent, the account belonging to Erling Hansen, a Danish
national. (*Id.* and Affidavit of Richard Velazquez, Crim. No.
1998-42, Doc. No. M-1 ["Velazquez Affidavit"].)

Alerted now to the fact that Diaz appeared to be part of a group
using multiple fraudulent credit cards, Agent Velazquez attempted
to locate the suspect. Working with Ms. Mary Payne, a manager at
the Renaissance Grand, Velazquez went about the hotel eventually
looking into the restaurant where he saw Mr. Diaz, whom he
recognized from the copy of the driver's license photo received
from Little Switzerland, sitting at a table with several others. (*Id.* at
75-76.) Ms. Payne identified two of these others as the occupants of
room 1213, who were later identified as defendants Cotto and
Llona. (*Id.* at 89.)

Velazquez chose to wait for backup and was later joined at the
Renaissance Grand by Special Agents Penn and Peru. The three
agents decided to wait until Diaz had returned to his room and to
confront him there. (*Id.* at 76.) But when Diaz reached his room, he
called the front desk asking that maintenance come around to look
at his television. (*Id.* at 76-77.) This gave the officers their chance.

Stationing Peru at the room's outside door, Velazquez and Penn
went to room 1113 accompanied by Oma Forbes, a hotel security
supervisor. (*Id.* at 77.) Ms. Forbes knocked on the door and
apparently called out, "It's engineering." (Transcript of Suppres-
sion Hearing on June 11, 1998 ["Tr. II"] at 26.) When Mr. Diaz
opened the door, Velazquez produced his credentials and placed
Diaz under arrest, without a warrant. (*Id.* at 77.) Diaz asked what
was going on and why he was being arrested. (*Id.* at 77.) When he
was told credit card fraud, and before he could be given his

*Miranda* warnings, Diaz said he had purchased a Diner's Club card for $ 500 in Argentina, this without prompting or questioning from the two officers or Ms. Forbes. (*Id.* at 77-78.)

Having been warned by the e-mail about the possibility of a gun being present, Velazquez and his fellow officers conducted a warrantless protective sweep of the room after they had placed Diaz in handcuffs. (*Id.* at 78, 123.) Looking around the room the officers noticed clothing and bags from several stores with outlets on St. Thomas. (*Id.* at 78.) Clothing with tags from Versace and Polo Ralph Laurent as well as a pair of Harley Davidson boots were seen. (*Id.*) Mr. Diaz was patted down and the areas under the mattresses were inspected. (*Id.* at 79.) In addition, Velazquez opened an unlocked briefcase he found in the room and found travel documents, airline tickets and a number of small passport type photographs of Diaz and Gonzalez. (*Id.* at 79, 80-83.) In addition, he found five passports in the names of Jorge Gonzalez, Gustavo Diaz, Gustavo Diaz Maniera, Claudio Cotto and Luis Fernando Llona. (*Id.* at 82.)

After taking Diaz into custody, Velazquez resumed surveillance of the other two suspects. (*Id.* at 90.) He observed one of the defendants, who was later identified as Cotto, walking from the restaurant back toward room 1213. (*Id.*) Velazquez confronted Cotto, identified himself as a police officer, and placed him under arrest. (*Id.*) A search of Mr. Cotto incident to his arrest revealed five credit cards, all bearing the name "Luis Aguilar." (*Id.* at 91.)[20] Also in his possession was an ID card bearing his own name and picture, as well as a Buenos Aires driver's license bearing the name Luis Aguilar and a picture of Mr. Cotto. (*Id.* at 100.)

Once the arrest of Cotto was completed, and knowing that two people had registered into room 1213 using a worthless credit card, Agent Velazquez returned to the restaurant to confront the other gentleman Ms. Payne had identified as an occupant of the room. Velazquez walked up to the table where this man was sitting, showed his identification, and asked for Luis Aguilar. (*Id.* at 92.)

---

[20] Officer Velazquez testified Cotto had six credit cards which all bore the name "Luis Aguilar." However, the inventory of items taken from Mr. Cotto's person indicates only five cards in Aguilar's name. The sixth card is in the name of "Roberto Rodriguez." *See* Govt's Ex. 8.

He received no response and walked away for a moment. (*Id.*) When he returned he tapped his suspect, later identified as Luis Fernando Llona, on the shoulder and asked him to walk with him to the residential area of the hotel. (*Id.*) As Mr. Llona accompanied Velazaquez back to his room, Velazquez and Penn placed Llona under arrest subsequent to a brief struggle during which Llona attempted to gain entry to his room. (*Id.* at 92-93.)

Once he was under arrest and without any prompting or questioning from the two officers, Llona told Velazquez that, if he were released, he would pay the officer $ 1,000. A search of Llona's person incident to arrest revealed he was carrying over $ 1,000 in cash, as well as four credit cards all with the name "Luis Aguilar."[21] Working with Oma Forbes, the hotel security supervisor, Agent Velazquez and his fellow special agents ensured rooms 1113 and 1213 were locked up before their departure. (Tr. II at 31.)

Before he left the hotel though after he had made all three arrests, Agent Velazquez was approached by a fourth individual, whom he later identified as Jorge Gonzalez. (Tr. I at 101.) Gonzalez told Velazquez he was an occupant of room 1113 and that he would like to retrieve some of his belongings from the room. (*Id.*) Velazquez told him that, as the room was now a crime scene, he could not get his property right then. (*Id.* at 102.) Velazquez gave Gonzalez a business card and arranged to meet with him at the Attorney General's office at 11:00 a.m. the next day [January 30, 1998]. (*Id.*)

Mr. Gonzalez came to the White Collar Crime Division office at the appointed time. (*Id.*) Out of an abundance of caution, Velazquez advised Gonzalez of his *Miranda* rights. (*Id.* at 102-03.) Velazquez asked Gonzalez how he came to be registered in Diaz' hotel room and Gonzalez told him that he was having some marital difficulty and that Diaz had told him that the trip would do him some good. (*Id.* at 103.) Velazquez had confiscated Gonzalez' travel documents and airline tickets at the time he searched room 1113; he told Gonzalez to meet him at the Renaissance Grand at 3:00 p.m. that afternoon to retrieve his property. (*Id.* at 104.)

---

[21] *See* Govt's Ex. 7.

Following his meeting with Gonzalez, Velazquez began a follow up investigation in company with an Assistant Attorney General of the Virgin Islands Department of Justice. (*Id.*) They visited three stores (Versace, Polo Ralph Laurent and Harley Davidson) based upon the clothing and the shopping bags discovered in rooms 1113 and 1213. At Harley Davidson, Velazquez met the manager, Monique Guadalpi. (*Id.* at 105.) He identified himself as a special agent of the Attorney General's office, informed her he was looking into a case of credit card fraud and showed Ms. Guadalpi the photograph of Diaz seized from the briefcase in room 1113.[22] (*Id.* at 104-05.) He asked if the individual had been in the store and Ms.Guadalpi replied that he had. (*Id.* at 106.) Only after she had made the identification did Agent Velazquez tell Guadalpi that he had arrested Diaz for suspected credit card fraud. (Transcript of Suppression Hearing on June 17, 1998, ["Tr. III"] at 14-15.)

Guadalpi testified that Diaz had come into the store twice on January 29th. (*Id.* at 6-8.) Guadalpi was as close as two feet to Diaz as he tried on a pair of boots. (*Id.* at 8.) She was able to identify Diaz in court as the man who had purchased the boots from her store. (*Id.* at 13-14.)

Velazquez and his companion next went to the Versace store and spoke with a member of the staff there, a Ms. Barbara Chi. (Tr. I at 106.) Again Velazquez presented his credentials and informed Ms. Chi he was investigating suspected credit card fraud. (*Id.*) He told Ms. Chi that a Mr. Diaz had been arrested on charges of credit card fraud and that some tags from Versace merchandise had been found in his possession. (*Id.* at 107.) He then showed Ms. Chi an Italian passport bearing the name "Gustavo Adrian Maniera," asked her if she recognized the person whose picture appeared there and received an affirmative response. (*Id.* at 106.)[23] Ms. Chi was unable to identify any of the other photographs when Velazquez showed her the other passports he had found in room 1113. (*Id.* at 108.)

Ms. Chi testified that Diaz had come in her store around 11:00 a.m. on January 29th. (*Id.* at 12.) She told the Court that Diaz came

---

[22] The photo was admitted as Govt's Ex. 14.

[23] The passport was introduced as Govt's Ex. 9.

in and selected several items such a shirts, bags and some swimwear. (*Id.* at 12-13.) When he was through making his selections, Diaz tendered a credit card to pay for the items. (*Id.* at 13.) Ms. Chi noticed that the face of the card indicated it had been issued by the Bank of Boston but she also noticed that the writing on the card was not the same as other Bank of Boston cards she had seen before. (*Id.* at 15.) She took Diaz' card and ran it through her equipment and then was required to wait what seemed to her a longer time than usual for an approval of the card. (*Id.* at 16.) Out of an abundance of caution, Ms. Chi called and got a telephonic authorization for the purchase. (*Id.*) Upon completion of the sale, Mr. Diaz indicated to Ms. Chi that he would return the next day to make other purchases.

According to Ms. Chi, Mr. Diaz was in the store altogether about 20 to 25 minutes making his selections, trying on items and making his purchase. (*Id.* at 15-17.) She had an opportunity during the time that he was in the store to observe him from as little as arm length during her interaction with Diaz. (*Id.* at 17.) Based upon her prior encounter, Ms. Chi was able to identify Diaz in court as without doubt the man who had visited her store and whom she had identified to Velazquez from the passport photo. (*Id.* at 19.) Ms. Chi testified she was only shown the one passport and no other photographs. (*Id.* at 33.)

Agent Velazquez took copies of the sales slips of Diaz' purchases from Harley Davidson and Versace. (Velazquez Affidavit.) He later determined these purchases were made with fraudulent credit cards. (*Id.*)

Agent Velazquez next went to the Polo Ralph Laurent store and there met a sales clerk named Robert Harrigan. (*Id.* at 108.) Velazquez told Harrigan he had several individuals in custody and that he was trying to find out whether any of them had made fraudulent credit card purchases in St. Thomas. (*Id.* at 109.) He then showed Harrigan a series of passports starting with Cotto's, whom Harrigan did not recognize as having been in his store. He then showed Llona's passport, whom Harrigan also did not recognize as a patron. (*Id.*)

Next, Velazquez showed Harrigan Diaz' passport, whom Harrigan recognized as a man who had come into his store the

previous day and looked at clothing without making any purchases. (*Id.*) Then, on a hunch, Velazquez showed Harrigan Gonzalez' passport. (*Id.*)[24] Harrigan identified Gonzalez as someone who also had come in the previous day and made credit card purchases. (*Id.*) Harrigan identified Diaz in court as the man who had been in his boutique without making any purchases. (*Id.* at 44.) He failed to identify Gonzalez in court, although, as government counsel pointed out, Gonzalez wore a moustache when he went in the store and had changed his appearance by shaving his moustache by the time of the suppression hearing. (*Id.* at 49, 110.)

Gonzalez purchased clothes in the amount of $232 from Polo Ralph Laurent using an American Express card embossed with his name and bearing the account number "3756 197697 14001." (*Id.* at 111.) Agent Velazquez contacted American Express security and spoke with a Ms. Mareno from whom he learned the number on the card was assigned to the account of a Spanish national, J. A. Nunez Herrero. On that basis, Ms. Mareno confirmed the Gonzalez transaction was fraudulent. (*Id.* at 112.)

Velazquez arranged to meet Gonzalez at the Renaissance Grand at 5:30 p.m. Upon his arrival, Velazquez escorted Gonzalez to a room behind the hotel front desk. In that room, Velazquez showed Gonzalez the sales slip from Polo Ralph Laurent, at which time Gonzalez denied having made the transaction. Velazquez then placed Gonzalez under arrest for credit card fraud. (*Id.* )

Agent Velazquez did not return to the rooms at the Renaissance Grand until Monday, February 2nd.[25] After determining the rooms were in the same condition as when they had been locked, the agents conducted a thorough search. (*Id.* at 98.)[26] As part of that search, the agents had the hotel security staff, led by Ms. Forbes, drill out a wall safe in room 1213. (Tr. II at 32-33.) In the safe, the agents found ten credit cards bearing the names "Roberto Garcia" or "Luis Aguilar." (*See* Govt's Ex. 15.) The property from the two

---

[24]Gonzalez' passport was admitted as Govt's Ex. 10.

[25]Velazquez initially testified he returned on February 3rd. (Tr. I at 97.) However he corrected his testimony. (Transcript of Suppression Hearing on June 11, 1998 ["Tr. II"] at 5-6.).

[26]Inventories of items seized were introduced as Govt's Exs. 15-17.

rooms, including items recovered from the wall safe, was gathered up and taken to the police evidence room.

## B. Analysis of Law & Fact

The Court first considers the motions challenging the photo identification of the defendants, discussing separately the identification of Diaz and Gonzalez. The court then explains its holding on the motion to suppress evidence taken subsequent to arrest, first treating the items seized from Diaz and statements he made subsequent to his apprehension. Lastly, the Court examines the claims of Cotto and Llona regarding items seized from their persons and from room 1213.

### 1. Photo Identification

Diaz has asserted two grounds why evidence of his photo identification should be suppressed. First, he maintains that the photos themselves are the fruit of an unlawful search and should be suppressed outright. He next argues that the procedure used by Special Agent Velazquez to obtain witness identification from the photographs was unduly suggestive. In this section, the Court will discuss this second contention, leaving discussion of the first claim to the Court's exploration of the propriety of a warrantless search of Diaz' hotel room subsequent to his arrest.

We start with the Supreme Court's examination of the issue of pretrial identification in *Manson v. Brathwaite*, 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243 (1977). In that case, an undercover policeman went to an apartment and made a purchase of heroin. The officer knocked on the door and it opened twelve to eighteen inches, permitting him to see the suspect inside and to pass him the money, whereupon the door was shut, to be reopened some five to seven minutes later so that the suspect could pass the drugs out to the undercover officer. While the door was open, the officer observed the suspect from a distance of about two feet. The lower courts eventually found that the officer had occasion to observe the suspect for at least a "couple of minutes." *Id.* at 108. The officer returned to the police station and gave a description of the suspect to his fellow detectives, one of whom thought he recognized the suspect from the description. This second officer obtained a

photograph of the suspect from police records and left it for the undercover officer, who first saw it two days after he had made the controlled buy.

The suspect, Brathwaite, was arrested some weeks later and charged with narcotics trafficking under state law. *Id.* at 101. At trial, the photograph was received into evidence and the undercover officer both made an in-court identification and testified he had no doubt whatsoever about his identification of the suspect from the photograph. *Id.* at 102.

On a federal *habeas corpus* following his conviction in state court, the Supreme Court refused to adopt a bright line rule that use of a single photograph for identification is per se constitutionally impermissible. Rather, reliability of the identification and an examination of the totality of the surrounding circumstances will determine if the identification evidence should be admitted. Such an assessment, the high court held, should include consideration of the factors which it adopted from *Neil v. Biggers*, 409 U.S. 188, 199-200, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972): (1) the opportunity of the witness to observe the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of his prior description of the criminal; (4) the witness' level of certainty in his identification; and, (5) the time elapsed between the crime and the identification.

### a. *Identification of Diaz*

Mr. Diaz was identified by three witnesses: Monique Guadalpi, Barbara Chi, and Robert Harrigan. The Court will assess the reliability of each witness' identification by applying the *Brathwaite* factors to each in turn.

### i. Monique Guadalpi

In Diaz' case, as in *Brathwaite*, it appears only one photograph was shown to Ms. Guadalpi.[27] For purposes of decision, the Court will assume that the procedure used in showing the witness only

---

[27] Regarding Monique Guadalpi's identification of Diaz there is some doubt how many photographs she was shown. She testified she was shown two. (Transcript of Suppression Hearing on June 17, 1998 ["Tr. III"] at 14-15.) Officer Velazquez testified he showed her only one. (Tr. I at 105-06.) Because the Court assumes the identification procedure

one photo of Diaz was impermissibly suggestive.[28] Under *Brathwaite*, this is not the end of the inquiry.

Monique Guadalpi had ample opportunity to observe Diaz before making the photo identification. She testified that he came in the store twice and that, while in the store the second time purchasing the boots, he was her only customer. She also testified Diaz was in her store for about ten minutes and that she stood at the counter with Diaz while her associate took care of ringing up the sale.

It appears she was paying good attention during her encounter with Mr. Diaz.[29] Though it had been several months, Ms. Guadalpi was able to give a description of some of the clothing Diaz wore when in her boutique. (Tr. III at 8.) She also gave a description of his height and weight, as well as his hair color and was able to gauge his age very accurately. (*Id.*) There is no information to evaluate on Ms. Guadalpi's prior description of the defendant, the third *Brathwaite* factor, but she was very certain of her identification. Special Agent Velazquez testified she was not the least hesitant in her identification. (Tr. I at 106.) Further, Ms. Guadalpi testified she was certain of her identification. (Tr. III at 17.) Lastly, there was only a short time between her encounter with Mr. Diaz and the time Agent Velazquez asked her to identify his photograph. According to Velazquez, he met with Ms. Guadalpi the day after Diaz had visited the Harley Davidson store.

■ The Court finds that Ms. Guadalpi's identification of Diaz is of sufficient reliability to be admitted into evidence. She had an opportunity to observe Diaz far longer than did the officer in *Brathwaite*, under much better lighting conditions and from a distance just as close, about two feet. *See Brathwaite*, 432 U.S. at 114-15. She demonstrated no uncertainty in her identification of Diaz, which took place the day following her encounter with him

---

used here was unduly suggestive, whether one or two pictures was shown is immaterial.

[28] "Identifications arising from single-photograph displays may be viewed in general with suspicion." *Brathwaite*, 432 U.S. at 116.

[29] In fact, during her testimony Ms. Guadalpi said that both she and her associate (another young lady) had remarked on Diaz' first visit to the Harley Davidson store and took note of how handsome he was. (Tr. III at 7.)

as a customer in her store. Further, she was paying attention during her encounter with Diaz. Ms. Guadalpi will be permitted to testify at trial about her in-court and photo identification of Diaz.

### ii. Barbara Chi

Ms. Chi, unlike Ms. Guadalpi, was shown more than one photograph, namely the other passports he had obtained from the Renaissance Grand. (Tr. I at 32, 108.) While it is a closer call, the Court will assume this identification procedure was unduly suggestive and will, therefore, apply the *Brathwaite* factors in analyzing the reliability of Ms. Chi's identification.

Ms. Chi had a good opportunity to observe Diaz, as he was the only customer in the well lighted Versace boutique for some twenty to twenty-five minutes, and she observed him from a distance of no more than two feet. (Tr. I at 14.) She also took a good look at him to be able to remember him on his promised return the next day. (*Id.* at 20.) Ms. Chi was able to give a description of what he was wearing that day, including a belt with one of her store's logos. (*Id.* at 18.) Like Ms. Guadalpi, Ms. Chi appears not to have given a contemporaneous description of Mr. Diaz. But she was very definite that she recognized the picture in one of Diaz passports as the fellow who had purchased items in her store the previous day. Again, only a single day had elapsed from the time Diaz was in her store until she identified him from his passport photo.

■ Accordingly the procedure used to obtain Ms. Chi's identification of Diaz was not so suggestive that it raises a substantial risk of misidentification. *See Brathwaite*, 432 U.S. at 116. She therefore will be allowed to testify at trial regarding her identification of Diaz and the out-of-court photo show-up.

### iii. Robert Harrigan

Mr. Harrigan had a good opportunity to observe Mr. Diaz, having remembered serving him on a prior occasion in 1997, when Diaz came in for about twenty minutes to purchase some items. (Tr. I at 40.) On January 29, 1998, Diaz was in the store for something less than five minutes, a longer time than that the Supreme Court found sufficient in *Brathwaite*. Harrigan approached Diaz to arms'

392

length during that brief interval and interacted with him enough to determine if he needed any assistance finding merchandise. (*Id.* at 42.) Also, the encounter took place during midday with sufficient light throughout the store.

Harrigan's attention was not distracted by other customers. (*Id.* at 42-43.) He was able to give a description of what Diaz had been wearing on the day in question, though he did not give a description contemporaneous with his identification of Diaz. Moreover there is no suggestion he was uncertain about the identification and counsel for Diaz did not cross examine Harrigan. Finally, Harrigan saw the photograph no more than twenty-four hours after having seen Diaz in the store.

Harrigan was shown more than one passport photograph one at a time, none of which he identified until he saw Diaz'. (*Id.* at 109.) But Velazquez did tell Harrigan he was investigating a credit card fraud case and that several suspects were in custody. (*Id.*) While the procedure and circumstances of this photo show-up were less suggestive than those of Ms. Chi and Ms. Guadalpi, the Court will give Diaz the benefit of the doubt, treat the identification as unduly suggestive, and weigh the reliability factors.

■ The *Brathwaite* factors again auger for admission of identification from Mr. Harrigan. The short time span, the lack of any evidence of overt persuasion by Velazquez, and the clear opportunity Harrigan had to make the identification all convince the Court there was no substantial chance of misidentification. Therefore, Harrigan will be permitted to make an in-court identification of Diaz at trial, and testify to his earlier photographic identification of Diaz.

### b. *Identification of Gonzalez*

As with Mr. Harrigan's photo identification of Diaz, the Court will evaluate his identification of Gonzalez as though the procedure used was unduly suggestive. Harrigan had a good opportunity to observe Gonzalez. He assisted in the sale to him and was with Gonzalez for ten to fifteen minutes, getting a look at him from arm's length. (*Id.* at 46-47.) Mr. Harrigan also paid attention to Gonzalez on the day he was in the store, since Gonzalez made the last purchase of the day just before closing, and he helped the

manager by wrapping Mr. Gonzalez' purchases. (*Id.* at 46.) Like Ms. Guadalpi and Ms. Chi, Mr. Harrigan did not give a description of Gonzalez before he saw the photograph. Harrigan was reasonably certain of his identification of Gonzalez and that he had no real doubt about his identification. (*Id.* at 57.) Harrigan saw the photos on January 30th, less than twenty-four hours after Gonzalez was in the store.

■ Weighing the evidence of reliability against that of the suggestiveness of the identification procedure used, the Court concludes that Mr. Harrigan may make an in-court identification of Mr. Gonzalez if he can and testify about the earlier out-of-court photographic identification. The fact that Mr. Harrigan was unable to identify Gonzales in court at the suppression hearing may also be brought out. Harrigan had a clear opportunity to observe Gonzalez for ten to fifteen minutes and the time span between his having seen the defendant and identifying his photo was very short. Also Harrigan was paying sufficiently close attention during his meeting with Gonzalez as he helped complete his purchase. In sum, the Court is persuaded there is less than a substantial likelihood of misidentification here.

2. Evidence Seized Subsequent to Arrest

The Court denies the defendants' motions to suppress evidence secured or seized subsequent to their arrest. With regard to Diaz, that evidence consists of items seized from room 1113 following to his arrest without warrant. With regard to Cotto and Llona, the evidence was taken from their persons subsequent to their arrests without warrants.

a. *Defendant Diaz*

In his view, Diaz' arrest was not valid because the police lacked probable cause to arrest him at the time he was apprehended. Probable cause exists,

when the facts and circumstances within the arresting officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed.

394

*United States v. Savage*, 564 F.2d 728, 732 (5th Cir. 1977) (citations and internal quotations omitted). The details of probable cause are not technical but "are the practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 93 L. Ed. 1879, 69 S. Ct. 1302 (1949).

In *Savage*, the defendant challenged his arrest in his hotel room on grounds the police lacked probable cause. Suspicion was first cast on the defendant after it was discovered he had given a vendor a counterfeit twenty dollar bill to pay for a pizza. The vendor gave the phoney bill to the police, who returned to the hotel in company with the vendor. Upon their entry to the defendant's room with his consent, the vendor identified the defendant. The Court held this to be sufficient probable cause for the defendant's arrest without a warrant. *Savage*, 564 F.2d at 733.

Just as in *Savage*, Agent Velazquez had sufficient probable cause to arrest Diaz without a warrant. He knew Diaz was registered in room 1113 and that the credit card used to secure the room was fraudulent. Velazquez had, therefore, sufficient ground to believe that a crime was being committed and that Diaz was the one who had committed the crime.[30] Furthermore, he had the information of the attempt to defraud the Little Switzerland store and he knew from the copy of the driver's license photograph that Diaz was the one who had made that attempt. Either of these sets of information alone was probable cause for a warrantless arrest of Diaz.

In *Savage*, the court of appeals found that probable cause to arrest the defendant without warrant legitimized the warrantless search of his hotel room.

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on

---

[30] Obtaining property by fraud is a crime in the Virgin Islands. 14 V.I.C. § 3004.

the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control" construing that phrase to mean the area from which he might gain possession of a weapon or destructible evidence.

*Id.* (quoting *Chimel v.California*, 395 U.S. 752, 762-63, 23 L. Ed. 2d 685, 89 S. Ct. 2034 (1969)).

Just as in *Savage*, Agent Velazquez and his fellow officers were justified in their examination of Diaz' room. Agent Velazquez and his fellow officers merely swept the room looking for weapons and evidence within the defendant's ready grasp.[31] For the same reasons, the search of the unlocked briefcase was proper, since it easily could have held a handgun, for which the e-mail gave the officer cause to be on the lookout. Further, since Velazquez saw clothing of different sizes in plain view within the room, a more extensive examination was warranted to eliminate any possibility of ambush by a concealed accomplice. Once evidence of crime was found during the protective sweep, the officers were empowered by *Chimel* to seize it even though no weapon was found.

■ In short, evidence obtained from Special Agent Velazquez' warrantless search of room 1113 subsequent to Diaz' lawful arrest will not be suppressed.[32]

---

[31] At the suppression hearing, Diaz' counsel questioned the need for the protective sweep and made quite a show of himself hopping about the courtroom as though his feet were manacled and asking Agent Velazquez derisively whether such a sweep was necessary. Counsel knows better. In addition to counsel's theatrical breach of courtroom decorum, the Court notes there is not a solitary shred of evidence that Diaz' feet were bound. The Court further notes that the mere fact someone is in handcuffs does not prevent them from grabbing and firing a handgun.

[32] Diaz' motion to suppress statements he made subsequent to his arrest can be quickly dispatched. To the extent he claims the statements were obtained in an arrest made without probable cause, the Court has just explained at length there indeed was

### b. *Defendants Cotto & Llona*

Like Diaz, Cotto and Llona contest the seizure of items from their persons on grounds their arrests were made without probable cause. Their argument fails for essentially the same reasons.

At the time he placed Cotto and Llona under arrest, Special Agent Velazquez knew from the e-mail supplied by Ms. Crowder that suspect Gustavo Diaz staying in the Renaissance Grand Hotel was working in concert with a "Luis Aguilar." Upon checking the hotel's registry, the agent discovered that Luis Aguilar was indeed registered in room 1213 with another man. Once he determined that 1213 had been procured by a fraudulent credit card, Agent Velazquez had probable cause to believe another crime was ongoing.

From conversations with Renaissance Grand employees, Velazquez was able to identify Cotto and Llona as those persons staying in room 1213. It was eminently reasonable for the agent to rely on the management of the hotel to correctly identify the guests staying in one of their hotel rooms. This information provided probable cause to arrest the individuals identified as Cotto and Llona for credit card fraud without the need for a warrant.

■ Under the principles quoted above from *Chimel,* following a valid warrantless arrest law enforcement officers may conduct a warrantless search of the arrestee for weapons and evidence. Since both Cotto and Llona were validly arrested without warrant, evidence seized from their persons incident to that arrest will not be suppressed.

### 3. Items Seized From Room 1213

Defendants Cotto and Llona complain of the search of room 1213 and pray for suppression of the evidence against them obtained therefrom. They claim that Agent Velazquez was not entitled to

---

probable cause for his arrest. As to any claim the statements should be suppressed because they were made to the police before he was apprized of his *Miranda* rights, the Court makes two observations. First, inculpatory statements made by criminal defendants which are not in response to interrogation or psychological ploys which are the functional equivalent of interrogation are fully admissible at trial. *Rhode Island v. Innis,* 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980). Second, Diaz' statements were volunteered and were not in response to questioning. (Tr. II at 77-78.) The Court rules Diaz' statements may be admitted at trial.

search the room they occupied under fictitious names by use of a fraudulent credit card, relying mainly on *Stoner v. California*, 376 U.S. 483, 11 L. Ed. 2d 856, 84 S. Ct. 889 (1962). The Court does not agree.

In *Stoner*, the defendant challenged his bank robbery conviction in state court on the ground that several items the police found during a warrantless search of his hotel room should have been suppressed. Police entered the room through the hotel's night clerk, who gave his consent to the inspection. *Id.* at 485-86. The Supreme Court reminded that it is the hotel **guest's** Fourth Amendment constitutional rights which are at stake and cannot be surrendered by the hotel staff. *Id.* at 489-90. So if Cotto and Llona were indeed **guests** in the Renaissance Grand, then the search of their rooms without a warrant would be illegal and evidence obtained thereby would have to be suppressed. The most relevant dictionary definition of "guest" is, "a person who lodges, boards, or receives refreshment **for pay** (as at a hotel, boardinghouse, restaurant) whether permanently or transiently." WEBSTER's THIRD NEW INTERNATIONAL DICTIONARY 1008 (1993) (emphasis added). Unlike the defendant in *Stoner*, Cotto and Llona obtained their room by fraud, did not pay for the privilege of lodging in the hotel, and are not, therefore, *bona fide* guests within the constitutional shelter of *Stoner*.

Back in the *Stoner* age, the Supreme Court required an intrusion into a constitutionally protected area enumerated in the Fourth Amendment itself before the police could run afoul of the law. *See* WAYNE R. LaFAVE & JEROLD H. ISRAEL, CRIMINAL PROCEDURE § 3.2 at 124 (2d ed. 1992). In 1967, the high court explicitly abandoned this "constitutionally protected area" approach by declaring inadmissible evidence obtained from a device placed atop a public phone booth by the Federal Bureau of Investigation. *Katz v. United States*, 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967). The Court held that by going into the phone booth and shutting the door, Mr. Katz had demonstrated a justifiable expectation of privacy which the government had violated by its electronic intrusion. *Id.* at 353. In his now legendary concurrence, Mr. Justice Harlan fleshed out what the Court meant.

> [T]he Fourth Amendment protects people, not places. The question, however, is what protection it affords to those people. Generally, as here, the answer to that question requires reference to a "place." My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable."

*Id.* at 361.

The Supreme Court has since ratified Justice Harlan's view. In *Rakas v. Illinois*, the high court upheld a warrantless search of an automobile, saying in part that

> a legitimate expectation of privacy . . . means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified and subjective expectation of privacy, but it is not one which the law recognizes as "legitimate." His presence . . . is "wrongful"; his expectation is not "one that society is prepared to recognize as 'reasonable.'"

439 U.S. 128, 143 n.12, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978) (quoting *Katz*, 389 U.S. at 361 (Harlan, J., concurring)). The Court noted that reasonable and legitimate expectations of privacy arise primarily from the right to exclude others. *Rakas*, 439 U.S. at 143 n.12.

This Court assumes that Cotto and Llona may have had a subjective expectation of privacy in their occupancy of room 1213. The issue of first impression is whether society is prepared to recognize as reasonable and legitimate a subjective expectation of privacy in the occupancy of a hotel room by fraud, that is, whether they are more like the *Rakas'* off-season burglar or *Stoner's* paying hotel guest. The Court's research has disclosed two courts in other jurisdictions which have found no such legitimate and reasonable expectation in similar fact situations.

A federal a district court upheld the admission of evidence seized in a warrantless search of hotel rooms the defendants had obtained by fraud. *United States v. Wai-Keung*, 845 F. Supp. 1548

(S.D. Fla. 1994). During an investigation of a fraudulent credit card ring, the police arranged with the management of a local hotel for an inspection of the suspects' rooms without securing a search warrant. In upholding the seizure of the items removed from a safe in one of the hotel rooms, the district court noted that the room was registered in the name and paid for with the credit card of another, and that the defendants there had not left any personal belongings behind. *Id.* "Society should not recognize an expectation of privacy in a hotel room obtained fraudulently, and we do not believe that such an expectation is legitimate or reasonable." *Id.* at 1563. That Cotto and Llona had personal possessions in room 1213 does not make their occupancy any less wrongful.

Nor does *Wai-Keung* stand alone. An intermediate appellate court in California has ruled that a defendant who had obtained a hotel room by use of a stolen credit card lacked standing to challenge the validity of a search of that room. *People v. Satz*, 61 Cal. App. 4th 322, 324 (Cal. Ct. App. 1998). The court noted that the critical factor in its analysis was the defendant's lack of a legitimate possessory interest in the hotel room because she had obtained it by fraud. *Id.* at 326.[33]

Agent Velazquez knew from conversations with Barbara Crowder and Karen Dent, independently confirmed by e-mail, that the various credit card transactions, including those used to obtain room 1213, were fraudulent. The Court has already concluded that this information amounted to probable cause to arrest. This information also provided probable cause to believe that the room 1213 had been fraudulently procured and to conduct the warrant-less searches of Cotto and Llona's rooms.

---

[33] Additionally, and as noted by the court in *Satz*, a number of federal appellate courts have held that one who overstays in a hotel room has no reasonable or legitimate expectation of privacy. *People v. Satz*, 61 Cal. App. 4th 322, 325 (Cal. Ct. App. 1998) (citing *United States v. Allen*, 106 F.3d 695, 699 (6th Cir. 1997); *United States v. Huffhines*, 967 F.2d 314, 318 (9th Cir. 1992); and *United States v. Rahme*, 813 F.2d 31, 34 (2d Cir. 1987)); *see also United States v. Kitchens*, 114 F.3d 29, 31 (4th Cir. 1997) (same); *United States v. Ramirez*, 810 F.2d 1338, 1341 (5th Cir. 1987) (same); *United States v. Rambo*, 789 F.2d 1289, 1295-96 (8th Cir. 1986) (same); and *United States v. Croft*, 429 F.2d 884, 887 (10th Cir. 1970) (same). If a person loses his legitimate expectation of privacy when the rental period of a hotel room has ended, it logically follows that a person has no legitimate expectation of privacy where the initial rental period was obtained fraudulently.

■ Just as in *Wai-Keung* and *Satz*, Agent Velazquez had probable cause to believe that defendants Cotto and Llona had procured lodging in room 1213 by fraud. Having wrongfully obtained occupancy, the defendants had no right to exclude others, particularly the agents of the hotel or the police. Whatever subjective expectation of privacy they may have had in the room, it is not one society recognizes as legitimate or reasonable for Fourth Amendment purposes. They were the equivalent of the off-season burglar and not the paying hotel guest. The warrantless entry into room 1213 and consequent seizure of items from the room and the wall safe were perfectly legitimate and the fruits of that activity will not be suppressed.[34]

### III. CONCLUSION

For the reasons set forth above, defendant's motions will all be denied, with exception that the motion for an *in camera* inspection of Agent Velazquez' personnel records will be granted. An appropriate order shall issue.

ENTERED this 10th day of September, 1998.

### ORDER

For the reasons set forth in the accompanying memorandum it is hereby

ORDERED that defendant Diaz' motion to compel the Government to provide discovery be and the same is hereby DENIED WITHOUT PREJUDICE. And it is further

ORDERED that defendant Diaz' motion for an order requiring the Government to provide the personnel records of Agent Richard Velazquez for an *in camera* inspection be and the same is hereby GRANTED. And it is further

ORDERED that defendant Diaz' motion to suppress evidence of his identification from photographs be and the same is hereby DENIED. And it is further

---

[34] The fact the officers entered room 1213 to search the wall safe some days after the arrest of Cotto and Llona is of no legal moment. Probable cause to search a place or thing, once established, does not abate by the mere passage of time. *See United States v. Boynes*, 149 F.3d 208, 1998 WL 378811, at *3 (3d Cir. 1998).

ORDERED that defendant Gonzalez' motion to suppress evidence of his identification from photographs be and the same is hereby DENIED. And it is further

ORDERED that defendant Diaz' motion to suppress evidence seized subsequent to his arrest be and the same is hereby DENIED. And it is further

ORDERED that defendant Diaz' motion to suppress statements he made subsequent to his arrest be and the same is hereby DENIED. And it is further

ORDERED that defendant Cotto's motion to suppress evidence seized from his person subsequent to his arrest be and the same is hereby DENIED. And it is further

ORDERED that defendant Llona's motion to suppress evidence seized from his person subsequent to his arrest be and the same is hereby DENIED. And it is further

ORDERED that defendant Cotto's motion, joined by defendant Llona, to suppress evidence seized from room 1213 of the Renaissance Grand Hotel in St. Thomas subsequent to their arrest be and the same is hereby DENIED. And it is further

ORDERED that defendant Diaz' motion to reconsider the Court's order of May 7, 1998, denying his motion to dismiss the indictment on grounds of former jeopardy be and the same is hereby DENIED.

ENTERED this 10th day of September, 1998.

Defendants' motions denied with exception that motion for an in camera inspection of Agent Velazquez' personnel records granted.